STATE OF NORTH CAROLINA v. ANGELA DEBORAH LEWIS

No. 558PA04

(Filed 7 October 2005)

**1. Constitutional Law— Confrontation Clause—unavailable declarant—testimonial or nontestimonial statement**

A trial court's determination of whether an unavailable witness's statements violate defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution includes: (1) an inquiry of whether the statement is testimonial or nontestimonial; (2) if the statement is testimonial, the trial court must then ask whether the declarant is available or unavailable to testify during the trial; and (3) if the declarant is unavailable, the trial court must determine whether the accused had a prior opportunity to cross-examine the declarant about this statement since, if the accused had such an opportunity, the statement may be admissible if it is not otherwise excludable hearsay, and if the accused did not have this opportunity the statement must be excluded.

**2. Constitutional Law— Confrontation Clause—unavailable declarant—testimonial and nontestimonial statements**

The Court of Appeals erred in an assault with a deadly weapon inflicting serious injury and felony breaking and entering case by granting defendant a new trial based on the erroneous conclusion that admission of the unavailable victim's statements to law enforcement violated defendant's rights under the

1

Confrontation Clause of the Sixth Amendment to the United States Constitution regarding the victim's responses to an officer's questions following the assault and robbery in the victim's home and the victim's subsequent identification of her attacker from a police photographic lineup, because: (1) under *Crawford v. Washington*, 541 U.S. 36 (2004), testimonial statements are inadmissible at trial unless the victim was unavailable and defendant had a prior opportunity to cross-examine the victim; (2) the victim's statements to the officer were nontestimonial statements and the Confrontation Clause does not prohibit their admission at trial since the officer's questioning of the victim and other witnesses was not structured police questioning when the focus of the officer's interview with the victim was to gather as much preliminary information as possible about the alleged incident, to determine if a crime had indeed been committed, to ascertain if medical attention was required, and to identify a potential perpetrator, and a person in the victim's position would not or should not have reasonably expected her statements to be used at trial; and (3) although the victim's identification of defendant to a detective was testimonial and should not have been admitted at trial unless defendant had an opportunity to cross-examine the victim based on the fact that it was made in response to structured police questioning and a reasonable person in the victim's position would expect her statements could be used at a subsequent trial, such error was harmless since there was competent overwhelming evidence of defendant's guilt.

Justice NEWBY concurring in part in a separate opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 166 N.C. App. 596, 603 S.E.2d 559 (2004), reversing judgments entered 28 January 2003 by Judge James C. Spencer, Jr. in Superior Court, Wake County and granting defendant a new trial. Heard in the Supreme Court 18 April 2005.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State-appellant.*

*Paul M. Green for defendant-appellee.*

BRADY, Justice.

The dispositive issue before this Court is whether a victim's responses to an investigating police officer's questions following an

assault and robbery in the victim's home and the victim's subsequent identification of her attacker from a police photograph lineup constitute testimonial statements under *Crawford v. Washington*, 541 U.S. 36 (2004). A unanimous panel of the Court of Appeals concluded the statements were testimonial and, therefore, inadmissible at trial unless the victim was unavailable and defendant had a prior opportunity to cross-examine the victim. *State v. Lewis*, 166 N.C. App. 596, 603 S.E.2d 559 (2004). For the reasons stated below, we reverse and remand the decision of the Court of Appeals.

## BACKGROUND

On 7 January 2002, Angela Deborah Lewis (defendant) was indicted for assault with a deadly weapon inflicting serious injury on Nellie Joyner Carlson (Carlson) and felony breaking and entering into Carlson's residence at 1312 Glenwood Towers, a public housing development for senior citizens located in Raleigh, North Carolina. On 7 October 2002, a subsequent grand jury indicted defendant for robbery of currency valued at approximately $3.00 from Carlson perpetrated through use of a dangerous weapon at the time of the assault. These three charges were consolidated for trial on 22 and 27 January 2003 in Wake County Superior Court.

Carlson, the only witness to the crimes, died prior to defendant's trial.[1] Because of Carlson's unavailability to testify at trial, the State called Officer Narley Cashwell and Detective Mark Utley of the Raleigh Police Department to testify regarding statements Carlson made during their investigation of the crimes. Defendant objected to the officers' testimony, but the trial court overruled defendant's objection as to each officer following *voir dire*. The trial court admitted Carlson's statements to Cashwell and Utley pursuant to N.C.G.S. § 8C-1, Rule 804(b)(5), which sets forth a hearsay exception for certain statements when the declarant is unavailable to testify at trial.

Officer Cashwell, a Line Corporal assigned to patrol downtown Raleigh, testified he responded to a call at Carlson's apartment at approximately 5:43 p.m. on 22 November 2001. Officer Cashwell was the initial officer on the scene. Upon his arrival, Officer Cashwell observed Carlson "sitting in a chair. . . . kind of hunched over." Two of Carlson's neighbors, Ida Griffin and John Woods, were in the apartment and approached Officer Cashwell before he could speak with Carlson. Officer Cashwell recorded a statement from Griffin, who

---

1. The parties entered into a stipulation that Ms. Carlson's death was not the result of the assault for purposes of this trial.

stated Carlson's telephone had been off the hook since at least 5:00 that afternoon. After unsuccessfully trying to call Carlson, Griffin went upstairs to Carlson's apartment where she found Carlson sitting in a chair. Griffin described the room as "tore up."

After speaking with Griffin, Officer Cashwell noted Carlson sitting in a chair, her face and arms badly bruised and swollen. He spoke with Carlson to determine whether she needed assistance and to find out what happened. Carlson complained of pain in her head, but seemed coherent and cognizant of her surroundings. She told Officer Cashwell the following:

> I was in the hall opening my door. My door was locked. I—I was at the door and she slipped up behind me. She asked me for some money. I said what do I look like, the money tree. She said—she said, you don't like me because I'm black. I told her I don't like whatever color she was. I opened the door and she pushed me inside. She grabbed my hair and pulled my hair. She hit me with her fist. She also hit me with a flashlight, phone and my walking stick. She hit me in the ribs with my walking stick. She took a small brown metal tin that I had some change in. I also had some change on the table that she took. I know her. She comes up here all the time begging for money. She visits a man at the end of the hall. I don't know her name but he might.

Officer Cashwell further testified Carlson got up from her chair and showed him the walking stick and flashlight, as well as the drawers the assailant opened apparently looking for money. She briefly described her assailant. Griffin testified at trial, mostly to corroborate Cashwell's statements regarding the sequence of events and the appearance of the apartment. Griffin also testified Carlson was visibly upset by the attack and in fact described Carlson as "in shock."

Detective Utley testified he had been one of the detectives on duty the night of the incident and was called to the scene later that evening. Officer Cashwell briefed him on the situation upon his arrival. Officer Cashwell also informed Detective Utley that one of Carlson's neighbors, Burlee Kersey, apparently knew the assailant. Detective Utley then met with Kersey, who gave defendant's name as the person Carlson had described. Detective Utley then testified he retrieved defendant's picture at the station house and printed it and the pictures of five other females with similar physical characteristics.

Detective Utley testified he interviewed Carlson later that evening at Wake Medical Center, where she was being treated for

injuries sustained during the assault. Detective Utley brought the six-person photographic lineup to the interview, which he showed to Carlson one photograph at a time. Detective Utley instructed Carlson "[T]he person that assaulted you or robbed you . . . may or may not be in this photographic lineup. This is something you would have to tell me." Carlson selected defendant's photograph, identifying defendant as the person who assaulted and robbed her. Detective Utley testified during *voir dire* he obtained the warrant for defendant's arrest based upon Carlson's identification of defendant in this photographic lineup.

On 27 January 2003, the jury found defendant guilty of assault with a deadly weapon inflicting serious injury, robbery with a dangerous weapon, and misdemeanor breaking or entering, which is a lesser included offense of felonious breaking or entering. On 28 January 2003, Judge Spencer found defendant's prior record level to be IV and also found the existence of one aggravating factor, that the victim was "very old." Judge Spencer sentenced defendant to consecutive terms of 144 months minimum to 182 months maximum imprisonment for robbery with a dangerous weapon and 48 months minimum to 67 months maximum for the remaining offenses. Defendant appealed, citing six assignments of error, two of which related to the allegedly erroneous admission into evidence of the statements Carlson made to Officer Cashwell and Detective Utley during their investigation.

On 19 October 2004, a unanimous panel of the Court of Appeals reversed defendant's conviction and awarded her a new trial. Although defendant argued on appeal that both statements the victim made to Raleigh police officers were inadmissible hearsay and did not satisfy the requirements of N.C.G.S. § 8C-1, Rule 804(b)(5), the Court of Appeals did not reach that issue; rather, pursuant to *Crawford*, 541 U.S. 36, the Court of Appeals concluded admission of Carlson's statements to law enforcement violated defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Lewis*, 166 N.C. App. at 600, 603 S.E.2d at 561.[2]

2. Defendant filed her appellant's brief in the Court of Appeals on 27 July 2003 and filed a reply brief in that Court on 9 February 2004. The State filed its brief on 22 August 2003. The United States Supreme Court issued its opinion in *Crawford* on 8 March 2004, well after Court of Appeals briefing in this case was completed. The following day, defendant filed a memorandum of additional authority citing *Crawford*. Defendant also filed a second memorandum of additional authority on 15 March 2004. On 17 March 2004, the instant case was argued before the Court of Appeals.

This Court must now determine whether the Court of Appeals erred by holding admission of (1) Carlson's statements to Officer Cashwell and (2) Carlson's identification of defendant from a photographic lineup administered by Detective Utley violated defendant's Sixth Amendment right to confront witnesses against her. We hold Carlson's statements to Officer Cashwell were non-testimonial statements and the Confrontation Clause does not prohibit their admission at trial. We further hold Carlson's identification of defendant to Detective Utley was testimonial and should not have been admitted at trial unless defendant had an opportunity to cross-examine Carlson; however, we hold such error was harmless.

## THE RULE AGAINST HEARSAY

The modern day prohibition against admission of hearsay developed at common law and was codified in the North Carolina Rules of Evidence upon their ratification on 7 July 1983. Act of July 7, 1983, ch. 701, 1983 N.C. Sess. Laws 666 (effective 1 July 1984 and applying to "actions and proceedings commenced after that date" and "to further procedure in actions and proceedings then pending," except as specified herein). The hearsay rule is an evidentiary rule directed at preserving the accuracy and truthfulness of trial testimony. *See Queen v. Hepburn*, 11 U.S. 290, 295, 7 Cranch 290, 296 (1813) (Chief Justice Marshall observing the "intrinsic weakness" of hearsay evidence is "its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover"); *State v. Lassiter*, 191 N.C. 210, 212, 131 S.E. 577, 579 (1926) (emphasizing the "inherent vice of hearsay testimony" is "that it derives its value not from the credibility of the witness himself, but depends upon the veracity and credibility of some other person from whom the witness got his information"). Because cross-examination of a declarant is the surest method of securing truthfulness, witnesses are generally not permitted to testify to statements made by others outside the courtroom unless the statements are offered for a purpose other than proving the truth of their content. N.C.G.S. § 8C-1, Rules 801, 802 (2003); *White v. Illinois*, 502 U.S. 346, 356 (1992) (Cross-examination is " 'the greatest legal engine ever invented for the discovery of truth' "; thus, "courts have adopted the general rule prohibiting the receipt of hearsay evidence.") (quoting *California v. Green*, 399 U.S. 149, 158 (1970)) (citation omitted). However, the North Carolina Rules of Evidence set forth exceptions to the rule against hearsay when factual circumstances surrounding a statement lessen the risk of unreliability. N.C.G.S. § 8C-1, Rules 803, 804 (2003). *See also State*

*v. Jefferson*, 125 N.C. 504, 506, 125 N.C. 712, 715, 34 S.E. 648, 649 (1899) (regarding dying declarations, "[t]he nearness and certainty of death are just as strong an incentive to the telling of the truth as the solemnity of an oath"); *Lush v. McDaniel*, 35 N.C. 327, 328, 13 Ired. 485, 487 (1852) ("The ground of receiving [medical] declarations is that they are reasonable and natural evidence of the true situation and feelings of the person for the time being.").

The Rules of Evidence categorize exceptions to the hearsay rule into two types: (1) exceptions listed in Rule 803, which apply regardless of the declarant's availability to testify at trial, and (2) exceptions listed in Rule 804, which apply only when the declarant is unavailable to testify at trial. N.C.G.S. § 8C-1, Rules 803, 804. Rules 803 and 804 contain identical catchall provisions for statements that do not meet the requirements of an enumerated exception but which "hav[e] equivalent circumstantial guarantees of trustworthiness." *Id.* Rules 803(24), 804(b)(5). The catchall provision set forth in Rule 804(b)(5), through which the statements at issue in the instant case were admitted into evidence, provides:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

*Id.* Rule 804(b)(5). This residual exception "provide[s] for treating new and presently unanticipated situations which demonstrate a trustworthiness within the spirit of the specifically stated exceptions." *Id.* Rule 803(24) cmt.

There exists a tension between the defendant's right of confrontation and the State's interest in protecting society. The balance between these sometimes competing interests is a difficult one to

maintain. Justice Benjamin Cardozo offered his insight into this balance: "But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." *Snyder v. Massachusetts*, 291 U.S. 97, 122 (1934).

## THE RIGHT TO CONFRONTATION

As explained above, the rule against hearsay is an evidentiary rule directed at preserving the accuracy and truthfulness of trial testimony. However, there exists a constitutional protection—the right to confrontation—which also restricts the admissibility of out-of-court statements at trial. This right is preserved in both the Sixth Amendment to the United States Constitution and the North Carolina State Constitution Declaration of Rights. It applies only in criminal prosecutions and may be invoked only by the accused. U.S. Const. amend. VI; N.C. Const. art. I, § 23.

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This federal constitutional protection is made applicable to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). Because the United States Supreme Court has determined the Sixth Amendment right to confrontation is binding on the states, the Court's Sixth Amendment jurisprudence represents a "constitutional floor" guaranteeing that fundamental right to all Americans. *State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998).[3]

### Historical Context

"The right to confront one's accusers is a concept that dates back to Roman times." *Crawford*, 541 U.S. at 43 (citing *Coy v. Iowa*, 487 U.S. 1012, 1015-16 (1988)). The Roman Governor Festus stated: "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, and have licence to answer for himself concerning the crime laid against him." *Acts* 25:16 (King James). Further, we note the importance of witness testi-

___

3. Similarly, the Declaration of Rights contained in the North Carolina State Constitution provides: "In all criminal prosecutions, every person charged with [a] crime has the right to . . . confront the accusers and witnesses with other testimony." N.C. Const. art. I, § 23. This Court has previously stated "there is no surer safeguard thrown around the person of the citizen than this guarantee contained in the Declaration of Rights." *State v. Hargrave*, 97 N.C. 354, 355, 97 N.C. 457, 458, 1 S.E. 774, 775 (1887).

mony in criminal cases dates back to the Old Testament. *See also Deuteronomy* 19:15 (King James).

Writing for the majority, Justice Scalia stated in *Crawford*: "[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford*, 541 U.S. at 50. This "civil-law mode of criminal procedure" was adopted in sixteenth and seventeenth century England, where evidence from criminal suspects, their suspected accomplices, and witnesses was taken by pretrial examination "before the Privy Council, in some cases by the judges, and in some instances by torture." 1 James Fitzjames Stephen, *A History of the Criminal Law of England* 325 (New York, Burt Franklin n.d.) (1883) [hereinafter 1 Stephen, *A History*]; *see also Crawford*, 541 U.S. at 43. At trial, "[t]he proof was usually given by reading depositions, confessions of accomplices, letters, and the like; and this occasioned frequent demands by the prisoner to have his 'accusers,' *i.e. the witnesses against him*, brought before him face to face." 1 Stephen, *A History* at 326 (emphasis added).

For example, in 1554 Sir Nicholas Throckmorton, a knight in the guildhall of London, was accused of "conspir[ing] and imagin[ing] the death of the queen[] [Mary's] majesty." *Trial of Throckmorton, in* 1 St. Trials 869, 870 (London, T.B. Howell 1816). Throckmorton was further accused of levying "war against the queen within her realm," providing "aid and comfort" to the queen's enemies, and planning to storm the Tower of London. *Id.* At Throckmorton's trial for high treason, the Crown presented the confession of Master Croftes alleging Croftes and Throckmorton, together with other accomplices, often discussed their plans against the queen. *Id.* at 875. Throckmorton responded to Croftes' confession, arguing:

> Master Croftes is yet living, and is here this day; how happeneth it he is not brought face to face to justify this matter, neither hath been of all this time? Will you know the truth? [E]ither he said not so, or he will not abide by it, but honestly hath reformed himself.

*Id.* at 875-76. Notwithstanding Throckmorton's demand to confront Croftes "face to face," Croftes was never produced as a witness and the jury later acquitted Throckmorton of treason, a decision for which the jurors were "severely fined." *Id.* at 899-900; *Proceedings against Throckmorton's Jury, in id.* at 901-02.

Similarly, the Crown tried Sir Walter Raleigh, then a knight at Winchester, for high treason against King James I in 1603. *Trial of Raleigh, in* 2 St. Trials 1 (London, T.B. Howell 1816) [hereinafter *Trial of Raleigh*]. Raleigh was charged with conspiring with Lord Cobham "to deprive the king of his Government; to raise up Sedition within the realm; to alter religion, to bring in the Roman Superstition and to procure foreign enemies to invade the kingdom." *Id.* The primary evidence presented by the Crown at trial was (1) the confession of Lord Cobham given in front of the Privy Counsel upon examination, and (2) a letter later written by Lord Cobham. *Id.* at 10-13, 20-24, 27-28. Both statements implicated Raleigh as a traitor against the king. *Id.* However, Lord Cobham retracted his confession before trial and sent a letter to Raleigh informing him so. *Id.* at 28-29; *see also White*, 502 U.S. at 361 (Thomas, J., concurring in part and concurring in the judgment) (stating Lord Cobham's confession was likely obtained through torture).

In his defense, Raleigh requested Lord Cobham be brought to testify in person, arguing:

> The [L]ord Cobham hath accused me, you see in what manner he hath foresworn it. Were it not for his Accusation, all this were nothing. Let him be asked, if I knew of the letter which Lawrency brought to him from Aremberg. Let me speak for my life, it can be no hurt for him to be brought; he dares not accuse me. If you grant me not this favour, I am strangely used; Campian was not denied to have his accusers face to face.

*Trial of Raleigh* 23. The court denied Raleigh's request, responding Lord Cobham could not be trusted to testify truthfully in person because he would desire to see "his old friend" Raleigh acquitted. *Id.* at 24. At the close of evidence, Raleigh was not acquitted; rather, after less than fifteen minutes of deliberation, the jury returned a guilty verdict. *Id.* at 29. Raleigh was confined to the Tower of London for fourteen of the fifteen years preceding his eventual execution for treason on 29 October 1618. *Id.* at 31-45; 1 Stephen, *A History* at 335.

It is with knowledge of this historical background that the Sixth Amendment was ratified in 1791 and the United States Supreme Court interpreted the Confrontation Clause in *Crawford. Crawford*, 541 U.S. at 43-47. Accordingly, Justice Scalia explained in *Crawford* that the Confrontation Clause safeguards a strong constitutional preference for live testimony and guarantees a criminal defendant's right

to cross-examine the witness who is the source of testimonial evidence against him. *Id.* at 54 ("[T]he common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine.").

### Confrontation Clause Jurisprudence

In *Ohio v. Roberts*, the United States Supreme Court applied the Sixth Amendment Confrontation Clause to prohibit introduction of preliminary hearing testimony given by a witness not produced at the defendant's subsequent state criminal trial. 448 U.S. 56 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004). The Court explained, "The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay." *Id.* at 65. "First, in conformance with the Framers' preference for face-to-face accusation . . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* Second, the proffered statement must contain " 'indicia of reliability' " that confirm the statement's trustworthiness. *Id.* (quoting *Dutton v. Evans*, 400 U.S. 74, 89 (1970) (plurality opinion)). Six years later in *United States v. Inadi*, the United States Supreme Court limited application of the *Roberts* unavailability analysis to cases involving prior testimony, holding the Confrontation Clause does not require unavailability in every case. 475 U.S. 387, 394 (1986) (concluding "the unavailability rule, developed in cases involving former testimony, is not applicable to co-conspirators' out-of-court statements"); *see also White*, 502 U.S. at 351 ("[O]ur later decision in *United States v. Inadi* foreclosed any rule requiring that, as a necessary antecedent to the introduction of hearsay testimony, the prosecution must either produce the declarant at trial or show that the declarant is unavailable." (citation omitted)).

Thereafter, in *Idaho v. Wright*, the United States Supreme Court reviewed the trial court's admission of a two and one-half year old child victim's hearsay statements to a medical doctor during the defendant's trial for two counts of lewd conduct with a child under sixteen. 497 U.S. 805, 808-09 (1990). The State introduced the child's statements through the doctor's testimony, and the trial court admitted the statements pursuant to Idaho's residual hearsay exception. *Id.* at 809-12. On appeal, the defendant argued admission of the doctor's testimony violated her Sixth Amendment right to confront witnesses against her. *Id.* at 812. The Court applied *Roberts*, explaining "indicia of reliability" may be shown in two ways: (1) "the hearsay

statement 'falls within a firmly rooted hearsay exception,' " or (2) the statement "is supported by 'a showing of particularized guarantees of trustworthiness.' " *Id.* at 816 (quoting *Roberts*, 448 U.S. at 66). When either criterion is met, it is " 'sufficiently clear . . . that the statement offered is free enough from the risk of . . . untrustworthiness,' " and cross-examination "would be of marginal utility." *Id.* at 819-20 (quoting 5 John Henry Wigmore, *Evidence* § 1420, at 251 (James H. Chadbourn rev. 1974)). This is the "rationale for permitting exceptions to the general rule against hearsay." *Id.* at 819.

The United States Supreme Court noted Idaho's residual hearsay exception is not "firmly rooted" for Confrontation Clause purposes. *Id.* at 817. Characterizing statements not within a firmly rooted hearsay exception as " 'presumptively unreliable and inadmissible for Confrontation Clause purposes,' " the Court stated, "[U]nless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." *Id.* at 818, 821 (quoting *Lee v. Illinois*, 476 U.S. 530, 543 (1986)). After reviewing the "totality of the circumstances," the Court found the State "failed to show that the [child's] incriminating statements to the pediatrician possessed sufficient 'particularized guarantees of trustworthiness' under the Confrontation Clause to overcome that presumption." *Id.* at 826-27.

Through *Roberts* and its progeny, the United States Supreme Court developed the constitutional rule that hearsay evidence is admissible at trial only if the evidence falls within a firmly rooted hearsay exception or the prosecution shows the evidence exhibits particularized guarantees of trustworthiness. In the case of prior testimony, the prosecution must also show the declarant was unavailable to testify at trial.

This constitutional rule, based upon the Confrontation Clause, applied in addition to state evidentiary rules governing hearsay. The United States Supreme Court has often noted the rule against hearsay and the Confrontation Clause share a common goal, which is to ensure the reliability of evidence presented at trial. *White*, 502 U.S. at 352-53; *Inadi*, 475 U.S. at 394; *Evans*, 400 U.S. at 86 (plurality opinion); *Green*, 399 U.S. at 155.

However, in *Crawford v. Washington*, the Court distinguished the Confrontation Clause from the rule against hearsay, categorizing

**STATE v. LEWIS**

[360 N.C. 1 (2005)]

the right to confront witnesses as a "procedural" guarantee, not a "substantive guarantee." 541 U.S. at 61. In so doing, the Court stated,

> To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.*

*Id.* (emphasis added).

In *Crawford*, the United States Supreme Court considered whether a trial court properly admitted the tape-recorded interview of a defendant's wife at the defendant's trial for assault and attempted murder. *Id.* at 38-40. The defendant maintained he stabbed the victim in self-defense during an argument. *Id.* at 38-39. The defendant's wife, who witnessed the stabbing, gave police an account of the incident that arguably conflicted with the defendant's claim of self-defense. *Id.* at 39-40. Although the defendant's wife did not testify at trial due to Washington State's marital privilege, the State introduced her earlier tape-recorded statement into evidence, and the jury convicted the defendant of assault.[4] The Washington State Court of Appeals reversed, holding the wife's statement was not reliable. *Id.* at 40. The Washington Supreme Court reinstated the conviction, concluding "although [the wife's] statement did not fall under a firmly rooted hearsay exception, it bore guarantees of trustworthiness." *Id.* at 41.

The statement at issue in *Crawford* was made at the police station house following *Miranda* warnings to the defendant and his wife during the course of police interrogation. *Id.* at 38. Thus, the United States Supreme Court concluded the statement was plainly testimonial. *Id.* at 53 n.4. Because the defendant did not have a prior opportunity to cross-examine his wife regarding her statement to police, the Court held admission of the statement violated the defendant's Sixth Amendment right to confront witnesses against him. *Id.* at 68-69. Accordingly, the Court reversed the decision of the Washington Supreme Court reinstating the defendant's conviction. *Id.* at 41, 69.

---

4. In Washington, the marital privilege belongs to the defendant; thus, the defendant can prevent his or her spouse from testifying by invoking the privilege. Wash. Rev. Code Ann. § 5.60.060 (West 2005). In contrast, in North Carolina criminal actions, the marital privilege belongs to the non-defendant spouse, and that spouse may refuse to testify without fear of being compelled to do so. N.C.G.S. § 8-57 (2003).

Building on an analytical framework first set forth by Justice Thomas in his concurring opinion in *White*,[5] the Court abandoned the substantive "reliability" rule of *Roberts* in favor of a procedural test. *Id.* at 61. "Where testimonial statements are involved," the Court stated, "we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Id.* "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68.

## TESTIMONIAL EVIDENCE

Following *Crawford*, the determinative question with respect to confrontation analysis is whether the challenged hearsay statement is testimonial. As stated above, testimonial evidence is inadmissible against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Id.* Despite the late Chief Justice Rehnquist's plea to the majority in *Crawford* that "the thousands of federal prosecutors and the tens of thousands of state prosecutors need answers as to what beyond the specific kinds of 'testimony' the Court lists is covered by the new rule. They need them now, not months or years from now," *id.* at 75-76 (Rehnquist, C.J., concurring in the judgment) (citation omitted), the Supreme Court chose to "leave for another day" the task of defining the term "testimonial," *id.* at 68. This Court is faced with the task of determining whether Carlson's statements in the instant case are testimonial. Although we acknowledge that the following sections of this opinion discussing preliminary hearings, grand jury testimony, and prior trial testimony are dicta because issues relating to those proceedings are not before us in this case, we are also aware that *Crawford* represents a significant departure from the now well-established analytical framework set out in *Ohio v. Roberts*. Recognizing the cogency of the late Chief Justice Rehnquist's observations in his concurrence in *Crawford*, we offer these discussions as guidance to our trial courts and litigants. Our discussion of the doctrine of forfeiture is presented in the same spirit.

5. In his opinion in *White v. Illinois*, 502 U.S. at 358, which concurred in part and concurred in the judgment, Justice Thomas argued United States Supreme Court case law has "confused the relationship between the constitutional right of confrontation and the hearsay rules of evidence." *Id.* Justice Thomas stated, "There appears to be little if any indication in the historical record that the exceptions to the hearsay rule were understood to be limited by the simultaneously evolving common-law right of confrontation." *Id.* at 362.

Our analysis is guided by (1) the Court's enumeration in *Crawford* of basic or "minimum" examples of testimonial evidence; (2) this Court's recent decisions applying *Crawford*, which are *State v. Bell*, 359 N.C. 1, 603 S.E.2d 93 (2004), *cert. denied*, —— U.S. ——, 125 S. Ct. 2299, 161 L. Ed. 2d 1094 (2005), and *State v. Morgan*, 359 N.C. 131, 604 S.E.2d 886 (2004); and (3) an analysis of how other jurisdictions have interpreted testimonial evidence.

"Testimonial" evidence refers to evidence produced by " 'witnesses' against" a criminal defendant. Such witnesses, who " 'bear testimony,' " are the subject of the Sixth Amendment. *Crawford*, 541 U.S. at 51 (quoting 1 N. Webster, *An American Dictionary of the English Language* (1828)). The United States Supreme Court determined in *Crawford* that "at a minimum" the term testimonial applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to *police interrogations*." *Id.* at 68 (emphasis added).

## Preliminary Hearings

Following *Crawford*, statements made by witnesses in preliminary hearings are very likely testimonial. However, in North Carolina, not all preliminary hearings in the trial division provide for testifying witnesses. The primary function of the initial appearance before the magistrate immediately after the defendant's arrest is to initiate the judicial process and to establish, among other things, the existence of probable cause. N.C.G.S. § 15A-511 (2003). The magistrate must inform the defendant of "(1) The charges against him; (2) His right to communicate with counsel and friends; and (3) The general circumstances under which he may secure release" under the provisions regarding bail. *Id.* § 15A-511(b)(1)-(3) (2003). Although there may be an affidavit in support of the defendant's arrest, this hearing, by its very nature, would almost certainly be deemed non-testimonial.

The first appearance in district court by a criminal defendant under N.C.G.S. § 15A-601 is "not a critical stage of the proceedings against the defendant" by statute, *id.* § 15A-601(a), and there are no witnesses; its primary function is warning the defendant of his right against self-incrimination and right to counsel, as well as determining the sufficiency of the charge, *id.* § 15A-602-604. In the superior court division, the defendant's arraignment does not involve any testimony by witnesses. *See id.* § 15A-941 (2003). These hearings do not appear to implicate *Crawford*.

However, several types of preliminary hearings may afford an opportunity for witness testimony, such as the probable cause hearing provided for in N.C.G.S. § 15A-606 and 15A-611, additional pretrial hearings such as those contemplated in N.C.G.S. § 15A-952 (such as motions to continue, motions for a change of venue, motions for a special venire, and motions to dismiss), and motions to suppress under N.C.G.S. § 15A-972. Statements by witnesses at all of these hearings are likely to be testimonial under *Crawford* and, if so, are inadmissible at trial unless the defendant had an opportunity to cross-examine the witness and the witness is unavailable at the time of the trial. As a practical consideration, preliminary hearings conducted in the district court are rarely recorded.

### Grand Jury Testimony

"Although '[d]ue process and notice requirements under the Sixth Amendment inure[] to state prosecutions,' this Court recently recognized 'to this date, the United States Supreme Court has not applied the Fifth Amendment indictment requirements to the states.' " *State v. Allen*, 359 N.C. 425, 438, 615 S.E.2d 256, 258 (2005) (alterations in original) (quoting *State v. Hunt*, 357 N.C. 257, 272-73, 582 S.E.2d 593, 603-04, *cert. denied*, 539 U.S. 985 (2003)). The grand jury indictment is the primary charging document for felonies in the superior court division. *See generally* N.C.G.S. § 15A-627 (2003). When a grand jury is convened, its proceedings are conducted in secret. *Id.* § 15A-623(e). The testimony of witnesses is rarely recorded. *See id.* § 15A-623(h) (allowing for grand jury witness testimony to be recorded by a court reporter only in specified circumstances). Therefore, witness statements would typically not be available at the later criminal trial, and the issue of whether these statements would be considered testimonial is not likely to arise at a subsequent trial.

### Prior Trial Testimony

The Supreme Court also included former trial testimony as "testimonial" in its definition in *Crawford*. Actual witness testimony from a jury trial is the classic example of statements that would be considered "testimonial" and thus almost always certainly subject to the limitations mandated by *Crawford*. If so, such witness testimony is inadmissible at the later criminal trial of the defendant unless the witness is unavailable for the later trial and the defendant had an opportunity to cross-examine the witness at the previous trial.

Police Interrogations

Compared to the other categories, the final category of "testimonial" evidence listed in *Crawford*, "police interrogations," is a more nebulous concept. In footnote four of *Crawford*, the Court further explained its use of the term "interrogation":

> We use the term "interrogation" in its colloquial, rather than any technical legal, sense. Just as various definitions of "testimonial" exist, one can imagine various definitions of "interrogation," and we need not select among them in this case. [Defendant's wife's] recorded statement, knowingly given in response to *structured police questioning*, qualifies under any conceivable definition.

541 U.S. at 53 n.4 (emphasis added) (citation omitted).

This Court recently addressed the meaning of "structured police questioning" in *State v. Bell* and *State v. Morgan*. In *Bell*, an Onslow County jury found the defendant guilty of first-degree murder, first-degree kidnapping, and burning of personal property. 359 N.C. at 8-9, 603 S.E.2d at 100. On appeal the defendant argued the trial court erred by admitting the testimony of Newton Grove Chief of Police John Conerly during the sentencing phase of defendant's trial. *Id.* at 34, 603 S.E.2d at 115. Chief Conerly testified he recorded a statement from the victim of a common-law robbery for which the defendant had been previously convicted. *Id.* Explaining the victim was not available to testify at trial, the prosecutor stated, " '[T]he victim was a Hispanic [man] and has left, we tracked, pulled the record, he's left the state and possibly the country.' " *Id.* (alteration in original). Thereafter, Chief Conerly testified regarding the contents of the victim's statement:

> "He [Gasca] stated that he was in West Hunting and Fishing. That he had seven hundred dollars, I believe he was sending back to his sister in Mexico. That someone ran up behind him and pushed and shoved him, grabbed his money. That he chased them outside. That they jumped into a vehicle and had taken off, and that he was struggling with the fella who was getting in the vehicle. That he cut him with what he thought was a knife."

*Id.* (alteration in original).

Upon review, this Court determined "the statement made by Gasca was in response to *structured police questioning* by [Chief]

Conerly regarding the details of the robbery committed by defendant." *Id.* at 36, 603 S.E.2d at 116 (emphasis added). Because "[t]here can be no doubt that [Gasca's] statement was made to further [Chief] Conerly's investigation of the crime" and "Gasca's statement contributed to defendant's arrest and conviction of common-law robbery," this Court determined Gasca's statement was "testimonial in nature." *Id.*

In *Morgan*, the defendant was convicted of first-degree murder in Buncombe County. 359 N.C. at 139, 604 S.E.2d at 891. On direct appeal, the defendant argued admission of Asheville Police Sergeant Douglas Berner's testimony regarding statements made by a witness during a police interview violated defendant's Sixth Amendment right to confrontation. *Id.* at 155-56, 604 S.E.2d at 901. This Court agreed with the defendant that "[the witness'] statement to Sergeant Berner was testimonial in nature because it was 'knowingly given in response to structured police questioning.' " *Id.* (quoting *Crawford*, 541 U.S. at 53 n.4).

This is not to say all statements made to law enforcement officers are testimonial; certain factors, such as the setting of the questioning and the role or responsibility of the officer, must be taken into account to determine if the declarant has been subjected to structured police questioning or police interrogation. Unfortunately, "interrogation" has as many potential definitions as does "testimonial." One definition of interrogation is "question[ing] typically with formality, command, and thoroughness for full information and circumstantial detail." *Webster's Third New International Dictionary* 1182 (1971).[6]

The model structure of a North Carolina law enforcement organization has three divisions: Staff services, uniformed patrol or field officers, and a criminal investigations or detectives division. Ronald G. Lynch, *Law Enforcement, in* Municipal Government in North Carolina 619, 630-31 (David M. Lawrence & Warren Jake Wicker eds., 2d ed., Inst. Of Gov't U. Of N.C. at Chapel Hill 1995) [hereinafter Lynch]. The service division is an administrative division in the orga-

---

6. *See also United States v. Bordeaux*, 400 F.3d 548, 556 (8th Cir. 2005) ("A police interrogation is formal (*i.e.*, it comprises more than a series of offhand comments—it has the form of an interview), involves the government, and has a law enforcement purpose."); *Mungo v. Duncan*, 393 F.3d 327, 336 n.9 (2d Cir. 2004), *cert. denied*, —— U.S. ——, 125 S. Ct. 1936, 161 L. Ed. 2d 778 (2005). (Citing, in dictum, the above definition of "interrogate" and concluding, "We believe the Supreme Court intended this more limited meaning, which is more consistent with the other types of testimonial statements the Court mentioned.").

nization with both sworn and unsworn personnel whose function is not pertinent to this discussion. The uniformed patrol or field officer's role is to respond to reports of crimes or 911 calls for assistance and to provide traffic enforcement and crime prevention through patrolling. *Id.* at 635-36. The patrol or field officer's responsibility at an alleged crime scene is to collect preliminary information necessary to understand what purportedly took place, determine if medical attention is required, secure the crime scene, and possibly identify a perpetrator. *Id.* at 637. Considering the role of these law enforcement officers, most information obtained in relation to an incident will not be testimonial because it is not the result of structured police questioning. As the Supreme Court of Nebraska noted:

> Police who respond to emergency calls for help and ask preliminary questions to ascertain whether the victim, other civilians, or the police themselves are in danger are not obtaining information for the purpose of making a case against a suspect. [Statements made as a result of these questions are] not made in anticipation of eventual prosecution, but [are] made to assist in securing the scene and apprehending the suspect.

*State v. Hembertt,* 269 Neb. 840, 852, 696 N.W.2d 473, 483 (2005) (citation omitted). Statements made by witnesses or victims in response to the above described scenario, though the police are making inquiries or performing various law enforcement activities, are not testimonial because they are not, by their very nature, considered structured police questioning.

Using the preliminary information gathered by the patrol or field officers, the investigations or detectives division typically reviews and consolidates field officers' preliminary reports, follows through with a determination of the identity of the subject(s) of the investigation, and prepares the case for the prosecution when all information is gathered. Lynch at 638. An investigator or team of investigators are assigned the responsibility of investigating criminal activity by gathering additional evidence and questioning witnesses and victims with more "formality, command, and thoroughness for full information and circumstantial detail" than a patrol officer, thus producing testimonial statements. *Webster's Third New International Dictionary* 1182 (1971).

To be sure, we do not find the role of a police officer determinative as to whether a statement is testimonial. A detective may

conduct preliminary investigations, which typically produce nontestimonial statements, and a field officer may conduct an entire investigation and gather a number of testimonial statements. The determinative factor is the particular status or stage of the investigation; when the investigation goes beyond preliminary fact-gathering, the investigation will tend to become structured police questioning and will likely produce testimonial statements. The role of the officer is merely a factor to be considered in determining the stage of the investigation.

In summary, structured police questioning is a key consideration in determining whether a statement is or is not testimonial. Structured police questioning or interrogation does not occur exclusively in a police station, as was the case in *Crawford*, 541 U.S. at 38-40. The questioning might also occur in a field location, detention facility, or the North Carolina Department of Correction. This questioning is in contrast to the initial gathering of information and determination of whether a crime was actually committed. Whether structured police questioning is present may also depend on the status of the investigation, as evidenced by the role of the officer(s) asking questions of the declarant. This distinction is an important one, because the statements made as a result of a patrol officer's preliminary questioning will likely be nontestimonial, while statements resulting from investigators' questions, which are made at a later point in time, will likely be testimonial.

The point at which questioning becomes "structured police questioning" is analogous to the line crossed when police involvement changes from mere presence to effecting a seizure of a person, *see Florida v. Bostick*, 501 U.S. 429, 434 (1991), or when police questioning takes a form requiring *Miranda* rights to be read, *see Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). So too a line is crossed when police questioning shifts from mere preliminary fact-gathering to eliciting statements for use at a subsequent trial. When this line is crossed, any statements elicited are testimonial in nature.

### Declarant's State of Mind

After a comprehensive survey of other jurisdictions regarding the application of *Crawford*, it appears another classification that has been used to determine whether a statement is testimonial or nontestimonial relies heavily on the total circumstances surrounding the declarant's statement. This classification must be made on

STATE v. LEWIS

[360 N.C. 1 (2005)]

a case-by-case basis.[7] Many courts also believe the examples of testimonial statements noted in *Crawford* share a common characteristic: The declarant's knowledge, expectation, or intent that his or her statements will be used at a subsequent trial.[8] We agree with both of these lines of thinking and thus hold an additional prong of the analysis for determining whether a statement is "testimonial" is, considering the surrounding circumstances, whether a reasonable person in the declarant's position would know or should have known his or her statements would be used at a subsequent trial. This determination is to be measured by an objective, not subjective, standard.

7. *See United States v. Brun*, 416 F.3d 703, 707 (8th Cir. 2005) (determining that a 911 call made "under these circumstances" was nontestimonial); *United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005) (looking at "[c]ertain factual circumstances surrounding an out-of-court statement . . . including formalized settings such as police interrogations" in determining whether a statement is testimonial); *United States v. Holmes*, 406 F.3d 337, 348 (5th Cir. 2005) ("[W]hether a challenged statement falls within the class of evidence deemed 'testimonial' will generally be outcome-determinative."); *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004) (considering the pertinent circumstances establishing "the declarant's position" in determining whether a statement was testimonial); *State v. Wright*, 701 N.W.2d 802, 812 (Minn. 2005) ("[S]tatements made to the police during a field investigation should be analyzed on a case-by-case basis according to the circumstances under which the statements are made."); *State v. Hembertt*, 269 Neb. 840, 851, 696 N.W.2d 473, 482-83 (2005) ("[W]hether a statement is testimonial depends on . . . the circumstances surrounding the making of the statement [which] illuminate the purpose or expectation of the declarant."); *State v. Davis*, 154 Wash. 2d 291, 302, 111 P.3d 844, 850 (2005) ("It is necessary to look at the circumstances of [the statement] in each case to determine whether the declarant knowingly provided the functional equivalent of testimony . . . .").

8. *See United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005) ("[A] statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime."); *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004) ("The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."); *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004) ("[T]he types of statements cited by the [United States Supreme] Court as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings."); *State v. Hembertt*, 296 Neb. 840, 851, 696 N.W.2d 473, 482 (2005) ("The determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial . . . . [W]hether a statement is testimonial depends on the purpose or expectation of the declarant in making the statement . . . ."); *State v. Davis*, 154 Wash. 2d 291, 302, 111 P.3d 844, 850 (2005) ("It is necessary to look at the circumstances of the 911 call in each case to determine whether the declarant *knowingly* provided the functional equivalent of testimony to a government agent.") (emphasis added).

**STATE v. LEWIS**

[360 N.C. 1 (2005)]

The Supreme Court of Minnesota most recently articulated a number of factors to be considered and weighed in determining whether a statement is testimonial. *State v. Wright*, 701 N.W.2d 802, 812-13 (Minn. 2005). Some of these factors include "whether the declarant was a victim or an observer[,] the declarant's purpose in speaking with the officer[,] . . . the declarant's emotional state when the statements were made, [and] the level of formality and structure of the conversation between the officer and declarant[,]" among others. *Id.* at 812. The Supreme Court of Minnesota noted that its list was not entirely inclusive, but these factors were a starting point for a court to determine whether a particular statement is or is not testimonial. *Id.* at 813. We do not specifically adopt any of the above cited interpretations of "testimonial;" however, we do find them instructive and helpful to the trial court.

[1] Thus, a trial court's confrontation analysis of a statement should proceed as follows: The initial determination is whether the statement is testimonial or nontestimonial. If the statement is testimonial, the trial court must then ask whether the declarant is available or unavailable to testify during the trial. If the declarant is unavailable, the trial court must determine whether the accused had a prior opportunity to cross-examine the declarant about this statement. If the accused had such an opportunity, the statement may be admissible if it is not otherwise excludable hearsay. If the accused did not have this opportunity, the statement must be excluded.

## CARLSON'S STATEMENTS TO LAW ENFORCEMENT

[2] Here, defendant challenges the trial court's admission of (1) Carlson's description to Officer Cashwell of the crimes and her attacker, and (2) Carlson's selection of defendant's picture from a photographic lineup prepared by Detective Utley. We conclude the first statement was not testimonial, but the second statement was made in response to structured police questioning and is therefore testimonial. Thus, Carlson's second statement should not have been admitted unless Carlson was unavailable to testify and defendant had a prior opportunity to cross-examine Carlson. *Crawford*, 541 U.S. at 68. However, we find the admission of the second statement to be harmless error.

The record reflects Officer Cashwell was dispatched to Carlson's apartment at approximately 5:43 p.m. on 22 November 2001 in response to a robbery call. Upon arrival, Officer Cashwell met Carlson's neighbors, Griffin and Woods, in the apartment and com-

menced his inquiries. Officer Cashwell recorded a statement from Griffin which he later included in his police report. From Griffin, Officer Cashwell learned Carlson's telephone had been off the hook since at least 5:00 that afternoon. After unsuccessfully trying to call Carlson, Griffin went upstairs to Carlson's apartment where she found Carlson sitting in a chair. Griffin described the room as "tore up" and noticed Carlson's telephone was on the floor and a nearby flashlight was broken. Thus, before speaking with Carlson, Officer Cashwell had reason to believe a crime may have been committed, but the seriousness and factual existence of a crime had not yet been established.

Officer Cashwell's questioning of Carlson and other witnesses was not "structured police questioning" as we believe the Supreme Court intended in *Crawford*. Officer Cashwell was a patrol or field officer, rather than a detective or investigator. The focus of Officer Cashwell's interview with Carlson was to gather as much preliminary information as possible about the alleged incident, to determine if a crime had indeed been committed, to ascertain if medical attention was required, and to identify a potential perpetrator. When Officer Cashwell spoke with Carlson, he did not have a substantial amount of information about the alleged incident. Officer Cashwell was the first responder to the scene, and his presence did not create the "formality, command, and thoroughness" typically found in an interrogation setting. Therefore we find Officer Cashwell did not engage in "structured police questioning" under *Crawford*.

We also find Carlson's statements to Cashwell were not testimonial because we do not believe a person in Carlson's position would or should have reasonably expected her statements to be used at trial. We first note that Carlson did not initiate the conversation with the police; the neighbors called the police without any direction from Carlson. Cashwell also interviewed Carlson at her home, and Cashwell was not the only person present when she made the statements, thus diminishing any formality that might be created by a police interview. Carlson was in a state of "shock" when Cashwell interviewed her, and she did not know the status of the investigation at the time of the interview. Although it is hard to discern Carlson's exact purpose in making her statements to Cashwell, it appears from these facts she did not know, nor should she have known, her statements would be used in a subsequent prosecution. Under these circumstances, her statements are more appropriately characterized as nontestimonial.

With respect to Carlson's photo identification of defendant, Detective Utley brought the photographic lineup to Carlson while she was being treated for her injuries at Wake Medical Center. When Detective Utley arrived at 10:15 p.m., he observed Carlson lying down "getting ready to have some type of scan done." Detective Utley then conducted the lineup stating, "[T]he person that assaulted you or robbed you . . . may or may not be in this photographic lineup. This is something you would have to tell me." At trial, Detective Utley testified he gives the same instruction every time he conducts a photographic lineup. Detective Utley then showed Carlson photographs of six women, one photograph at a time. After Carlson selected defendant's photograph, Detective Utley "went and gave probable cause to the magistrate," obtaining a warrant for defendant's arrest. The warrant named Carlson as the sole witness against defendant.

By conducting the photographic lineup, Utley crossed the line between making preliminary observations about an alleged crime and structured police questioning. The lineup served as a continued investigation, based on and occurring after the preliminary investigation conducted by Officer Cashwell. At the time of the lineup, Utley knew what allegedly happened to Carlson and had previously narrowed the scope of potential suspects. His purpose in conducting the interview was to establish probable cause to obtain a warrant specifically for Angela Deborah Lewis' arrest. Additionally, at the time of the interview, based upon the specific circumstances, Carlson knew an investigation was underway, and a reasonable person in Carlson's position would expect her statements could be used at a subsequent trial. Thus, the circumstances surrounding Utley's interview of Carlson at the hospital tip the scales in favor of the interview's being structured police questioning.

Initially, we note several distinctions between Carlson's first statements to Raleigh police and the "*ex parte* examinations" introduced pursuant to the "civil-law mode of criminal procedure" discussed in *Crawford*. 541 U.S. at 50. Specifically, the statements made by the declarant in the present case were made in the declarant's home, rather than at a police station house, as was the case in *Crawford. Id.* at 38. Additionally, in the present case, the declarant made her first responses to Officer Cashwell during the preliminary stages of the inquiry; in *Crawford*, the declarant made her statements to coercive law enforcement officers while she was in custody. Clearly, the investigation at issue in *Crawford* had progressed much further than Officer Cashwell's investigation when he

first spoke with Carlson. The interview by police in *Crawford* contained the "formality, command, and thoroughness" to make the interview structured police questioning, while the first interview of Carlson by Officer Cashwell lacked the requisite qualities of "structured police questioning."

More importantly, Carlson's statements in the present case are much different from this Court's analysis of structured police questioning in *Bell* and *Morgan*. In *Bell*, this Court determined the victim's statements were made pursuant to "structured police questioning." 359 N.C. at 36, 603 S.E.2d at 116. The challenged statements in *Bell* were made by a declarant to the Chief of Police of the town where the crime occurred; the Chief of Police also obtained the statements after he was briefed on the incident by the first responding patrol officer. As stated before, the role of a police officer in obtaining statements during an investigation is not determinative; however, the officer's role can serve as evidence of the stage of an investigation. Thus, because the statements in *Bell* were obtained by the town's Chief of Police after the Chief learned about the alleged incident, they show the investigation was at a more developed stage than the preliminary investigation conducted by Officer Cashwell in this case. Further, the setting created by an interview with the town's Chief of Police created the "formality" and "command" seen in structured police questioning.

Similarly, in *Morgan*, this Court found a declarant's statements were testimonial because they were produced by structured police questioning. 359 N.C. at 155-56, 604 S.E.2d at 901. The challenged statements in *Morgan* were obtained by a sergeant in the Asheville Police Department's criminal investigations division. *Id.* at 153, 604 S.E.2d at 899. The sergeant arrived approximately one hour after law enforcement had been called to the scene of the crime. After learning of the incident from a patrol officer's preliminary investigation, the sergeant interviewed one of the witnesses alone in his police car. The stage of the investigation, the role of the officer, and the location of the questioning clearly indicate that the sergeant in *Morgan* was building on previously obtained information to narrow the scope of the investigation using structured police questioning. In contrast, Officer Cashwell's investigation was preliminary and did not create an interrogation setting at Carlson's home, and a reasonable person in Carlson's position would not have believed her statements would be used at a subsequent trial. Thus, Carlson's first statements to Officer Cashwell were nontestimonial, while

statements obtained under the circumstances in *Bell* and *Morgan* are testimonial.

However, Carlson's subsequent identification of defendant from the photographic lineup prepared by Detective Utley was made at a point in the investigation beyond mere preliminary stages that reached "structured police questioning," as was the case in *Crawford*, *Bell*, and *Morgan*. Accordingly, the statements made by Carlson to Detective Utley were in response to structured police questioning and, under *Crawford*, are testimonial.

## FORFEITURE OF THE RIGHT OF CONFRONTATION

Despite its importance, a defendant may forfeit the right of confrontation through wrongdoing in cases where the defendant is the cause of the witness's unavailability. The United States Supreme Court first enunciated the concept of forfeiture of a defendant's right of confrontation over 100 years ago:

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

*Reynolds v. United States*, 98 U.S. 145, 158 (1878). The Federal Rules of Evidence codified the doctrine in 1997: "A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is admissible. Fed. R. Evid. 804(b)(6). In *Crawford*, the Supreme Court explicitly accepted this doctrine. 541 U.S. at 62 (stating that "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds"). In that case, the defendant caused his wife's unavailability by invoking his marital privilege, *id.* at 40, but, because of the importance society places on this privilege, exercising this privilege is not considered the type of "wrongdoing" that necessitates forfeiture of the defendant's right of confrontation.

In interpreting the concept of forfeiture, different jurisdictions have developed different rules about which actions by the defendant constitute forfeiture of his confrontation rights. Most recently, the Supreme Court of Minnesota stated that "a defendant will be found to have forfeited by his own wrongdoing his right to confront a witness against him if the state proves that the defendant engaged in wrongful conduct, that he intended to procure the witness's unavailability, and that the wrongful conduct actually did procure the witness's unavailability." *Wright*, 701 N.W.2d 802 at 814-15. The Supreme Court of Kansas dealt with the most obvious example of wrongdoing—the defendant's murder of the witness in question—and adopted the reasoning of an amicus brief filed in the case:

> "If the trial court determines as a threshold matter that the reason the victim cannot testify at trial is that the accused murdered her, then the accused should be deemed to have forfeited the confrontation right, *even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable.*"

*State v. Meeks*, 277 Kan. 609, 615, 88 P.3d 789, 794 (2004).

Of course, not all instances of defendant wrongdoing will be so obvious, nor does the defendant need to actually cause the death of the witness in order to have forfeited his confrontation right. The Supreme Judicial Court of Massachusetts explained:

> [T]he causal link necessary between a defendant's actions and a witness's unavailability may be established where (1) a defendant puts forward to a witness the idea to avoid testifying, either by threats, coercion, persuasion, or pressure; (2) a defendant physically prevents a witness from testifying; or (3) a defendant actively facilitates the carrying out of the witness's independent intent not to testify.

*Commonwealth v. Edwards*, 444 Mass. 526, 541, 830 N.E.2d 158, 171 (2005) (footnote omitted). The United States Court of Appeals for the Fourth Circuit extended this idea and held a defendant may even be determined to waive his right of confrontation merely by acquiescing in the wrongdoing that procured the unavailability of the witness, even without his direct participation. *United States v. Rivera*, 412 F.3d 562, 567 (4th Cir. 2005) (citing *United States v. Thompson*, 286 F.3d 950, 963-64 (7th Cir. 2002); *United States v. Cherry*, 217 F.3d 811, 820 (10th Cir. 2000); *United States v. Mastrangelo*, 693 F.2d 269, 273-74 (2d Cir. 1982); *Olson v. Green*, 668 F.2d 421, 429 (8th Cir. 1982)).

In the instant case, whether defendant participated in procuring the unavailability of the victim and witness, Ms. Carlson, is not an issue raised on appeal. Ms. Carlson's official cause of death was pneumonia, and the State stipulated for purposes of the trial that defendant was not responsible for her death. Therefore, we do not decide whether defendant forfeited her confrontation right as guaranteed by the Sixth Amendment.

## HARMLESS ERROR

Although we determined the trial court's admission of Detective Utley's testimony regarding Ms. Carlson's identification of defendant from her photograph was in error, we hold such error was harmless.

The United States Supreme Court first recognized the concept of harmless error in *Kotteakos v. United States*, 328 U.S. 750 (1946). "[T]he question is, not [was the trial court] right in [its] judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision." *Id.* at 764. "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . ." *Id.* Noticing the traditional harmless error standard articulated in *Kotteakos* might "work very unfair and mischievous results when . . . the question of guilt or innocence is a close one," the United States Supreme Court recognized harmless constitutional error review must be more stringent. *Chapman v. California*, 386 U.S. 18, 22 (1967). When the error involves a defendant's constitutional right, the "error is presumed to be prejudicial unless the State can show that the error was harmless beyond a reasonable doubt, meaning that 'the error complained of did not contribute to the verdict obtained[.]' " *Allen*, 359 N.C. at 441-42, 615 S.E.2d at 267 (quoting *Chapman*, 386 U.S. at 24 (1967)). Subsequently, in *Neder v. United States*, the United States Supreme Court offered guidance on how the harmless constitutional error standard is to be analyzed: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" 527 U.S. 1, 18 (1999).

North Carolina incorporated the United States Supreme Court's rationale of *Chapman* into our own harmless constitutional error statutory scheme and jurisprudence. The applicable statute states: "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt." N.C.G.S. § 15A-1443(b)

(2003). One way for the appellate court to determine whether a constitutional error is harmless beyond a reasonable doubt is to ascertain whether there is other overwhelming evidence of the defendant's guilt; if there is such overwhelming evidence, the error is not prejudicial. *See State v. Tirado,* 358 N.C. 551, 581, 599 S.E.2d 515, 536 (2004), *cert. denied,* —— U.S. ——, 125 S. Ct. 1600, 161 L. Ed. 2d 285 (2005).

In the case *sub judice,* the outcome of the jury trial would have been the same had Carlson's statement to Utley identifying defendant's picture not been admitted because competent overwhelming evidence of defendant's guilt existed. We have already held Carlson's initial statements to Officer Cashwell were not testimonial in nature and thus, were properly admitted by the trial court under *Crawford.* These initial statements already identified defendant as a particular woman matching defendant's age and physical description who frequently visited Kersey, one of Carlson's neighbors. Part of Carlson's initial statement to Officer Cashwell was "I know her." When Carlson made these statements to Officer Cashwell, she knew who committed the assault; she just did not know defendant's name.

Carlson's indication from the photographic lineup of defendant as her assailant merely confirmed the earlier statement, "I know her." Had the contents of Carlson's conversation with Detective Utley not been admitted by the trial court, sufficient overwhelming evidence remained in the record identifying defendant as the assailant so that the jury would have reached the same result. Detective Utley testified Kersey gave him defendant's name as the woman who visited him and matched the physical description Carlson gave to Officer Cashwell. That Carlson later confirmed defendant's picture as being a picture of the assailant did not change the initial identification of defendant as the assailant.

## CONCLUSION

For these reasons, we hold Carlson's statements to Officer Cashwell were non-testimonial statements not subject to the requirements of unavailability and cross-examination set forth in *Crawford.* We further hold Carlson's statement to Detective Utley identifying defendant as her assailant was a testimonial statement subject to the requirements in *Crawford.*

There is no question Carlson, who died prior to defendant's trial, was unavailable to testify. It is also undisputed that defendant had no

**STATE v. LEWIS**

[360 N.C. 1 (2005)]

prior opportunity to cross-examine Carlson regarding the statements introduced by the State at trial. Accordingly, admission of the statement Carlson made to Detective Utley violated defendant's right to confront witnesses against her.

However, this error was "harmless beyond a reasonable doubt." N.C.G.S. § 15A-1443(b); *see, e.g., Bell*, 359 N.C. at 36-37, 603 S.E.2d at 116-17 (applying harmless error analysis to erroneous admission of victim's statement in violation of *Crawford*). Thus, we reverse the decision of the Court of Appeals granting defendant a new trial and remand the matter to the Court of Appeals for consideration of the remaining assignments of error.

REVERSED and REMANDED.

Justice NEWBY concurring in part and in the judgment.

Along with the majority, I believe the admission of Ms. Carlson's statement to Officer Cashwell comports with *Crawford v. Washington*, 541 U.S. 36 (2004). Unlike the majority, I do not think *Crawford* requires the exclusion of Ms. Carlson's photographic identification of defendant. I fear today's ruling will bar vital evidence in future criminal cases even though *Crawford* itself would not dictate such a result.

*Crawford* interprets the Confrontation Clause[9] to mandate the exclusion of "testimonial evidence" unless (1) the witness is unavailable at trial and (2) the defendant had a prior opportunity for cross-examination. *Id.* at 54. The principal difficulty for this Court and others is that *Crawford* leaves "testimonial" largely undefined. *Id.* at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' "); Leading Cases: I.B. Criminal Law and Procedure, 118 Harv. L. Rev. 248, 322 (2004) ("Remarkably, then, even as it held that the Confrontation Clause reflects an 'acute concern' with testimonial statements, the Court was silent as to the exact scope of the Clause's reach.") (footnotes omitted). The United States Supreme Court did offer four examples of testimonial evidence: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to *police interrogations*." 541 U.S. at 68 (emphasis added).

---

9. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . . " U.S. Const. amend. VI.

**STATE v. LEWIS**

[360 N.C. 1 (2005)]

While the first three of these examples involve readily identifiable legal proceedings, it is not always easy to ascertain the point at which police interaction with witnesses or suspects becomes interrogation. The Supreme Court implicitly acknowledged this problem but refused to delineate precisely where police interviews end and interrogations begin. *Id.* at 53 n.4 ("Just as various definitions of 'testimonial' exist, one can imagine various definitions of 'interrogation,' and we need not select among them in this case."); *see also* Ralph Ruebner & Timothy Scahill, Crawford v. Washington, *the Confrontation Clause, and Hearsay: A New Paradigm for Illinois Evidence Law*, 36 Loy. U. Chi. L.J. 703, 716 (2005) ("Implicitly, not every conversation with the police will qualify as a testimonial statement.") The most guidance the Court would provide was that it applied interrogation in the term's "colloquial, rather than any technical legal, sense." 541 U.S. at 53 n.4. Thus, our review of alleged *Crawford* violations turns on whether the police interview in a given case amounts to interrogation as the term is used in ordinary conversation.[10] *See* The Oxford American College Dictionary 273 (2002) (defining "colloquial" as "used in ordinary conversation; not formal or literary").

For now, *Crawford* furnishes the only illustration of what the Supreme Court intends by "interrogation." There the defendant and his wife Sylvia went to the victim's residence after Sylvia claimed the victim had tried to rape her. 541 U.S. at 38. A fight ensued, during which the defendant stabbed the victim. *Id.* Police officers arrested the defendant and his wife. After giving Sylvia a *Miranda* warning, police detectives twice questioned her, making it clear her release " 'depend[ed] on how the investigation continue[d].' " *Id.* at 65 (first alteration in original). Sylvia eventually implicated her husband "[i]n response to often leading questions[.]" *Id.* Writing for the Supreme Court, Justice Scalia emphasized: "Sylvia Crawford made her statement while in police custody, herself a potential suspect in the case." *Id.* Hence, her "recorded statement, knowingly given in response to *structured police questioning*, qualifies under any conceivable definition [of interrogation.]" *Id.* at 53 n.4 (emphasis added).

Dramatic factual differences separate *Crawford* from Ms. Carlson's photographic identification of defendant. Never a suspect, Ms. Carlson was the elderly victim of a robbery and assault that left her with bruising over one eye, a contusion to the right frontal lobe of one lung, and three fractured ribs. Whereas Sylvia Crawford was

---

10. Where exactly courts are to locate an authoritative expression of interrogation's colloquial meaning remains an epistemological mystery.

interrogated at a police station, Detective Utley approached Ms. Carlson at the hospital. Specifically, he found Ms. Carlson awaiting tests and "still strapped [to] the board [on which] she was transported [from home]." The *Crawford* detectives posed leading questions and pressured Sylvia Crawford to implicate her husband. Avoiding leading questions, Detective Utley simply informed Ms. Carlson the photographs "may or may not" contain a picture of her assailant. He then showed her six photographs one at a time. Unprompted, Ms. Carlson identified defendant as her attacker.

The questioning of Sylvia Crawford manifestly satisfies the dictionary definition of interrogation, which, if not dispositive, is at least pertinent. According to *The Oxford American College Dictionary* 697 (2002), "to interrogate" is to "ask questions of (someone, esp. a suspect or a prisoner) closely, aggressively, or formally." This denotation aptly describes Sylvia's treatment at the hands of police detectives. On the other hand, the same cannot be said of Ms. Carlson's photographic identification. Detective Utley's bedside lineup was hardly formal, and nothing about it suggests the detective behaved aggressively. Moreover, the narrow scope of the examination argues against characterizing it as a detailed inquiry or structured police questioning. *See State v. Nix*, 2004-Ohio-5502 ¶77 (Ohio Ct. App.) (holding a hospitalized victim's photographic identification of his assailant was not testimonial when the victim "was not a suspect in any crime, and . . . not under any form of custody that would have led to *Miranda* warnings and the type of 'structured [police] questioning' sufficient to be called a police 'interrogation' . . . in the colloquial sense of the word.").

Many of the factors the majority isolates as relevant to recognizing interrogations seem consistent with *Crawford*. The majority advises our trial courts to consider, *inter alia*, "the setting of the questioning" and the "role or responsibility of the officer." It distinguishes "preliminary fact-gathering" from "structured police questioning;" "preliminary fact-gathering" becomes "structured police questioning," and therefore interrogation, when law enforcement employs formality and command to "elicit[] statements for . . . trial." The application of these criteria to the facts of *Crawford* would doubtless lead to the same conclusions as those reached by the Supreme Court. However, it likewise should have led the majority to determine Ms. Carlson's photographic identification was not testimonial. "[F]ormality and command" were entirely absent from Detective Utley's lineup, and, consequently, it did not constitute an interrogation.

STATE v. LEWIS

[360 N.C. 1 (2005)]

The majority completes its analytical framework for evaluating potential *Crawford* violations with the following "additional prong:" "whether a reasonable person in the declarant's position would know or should have known his or her statements would be used at a subsequent trial." Neither Detective Utley nor Ms. Carlson had grounds to anticipate Ms. Carlson's unavailability at trial and the ensuing need to use her photographic identification. Furthermore, the conditions under which Ms. Carlson performed her identification (strapped to a board at the hospital and awaiting tests) make it doubtful she spoke with defendant's trial in mind. Of course, she realized Detective Utley hoped to apprehend her assailant, and Detective Utley certainly presented his lineup with a view toward establishing probable cause. Yet in its comments on initial appearances held pursuant to N.C.G.S. § 15A-511, the majority indicates merely acting to establish probable cause is ordinarily not enough to render evidence testimonial.

"[T]he central [aim] of a criminal trial is to decide the factual question of the defendant's guilt or innocence." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Today's unintentional extension of *Crawford* could subvert this goal by depriving juries of evidence that would otherwise aid them in their efforts to discern the truth. Such an outcome is sure to erode public respect for the judicial process. As with Ms. Carlson's statement to Officer Cashwell, I am convinced Ms. Carlson's photographic identification of defendant is not testimonial. Notwithstanding my disagreement with the majority over the status of the photographic identification, I agree the instant case should be remanded to the Court of Appeals for review of defendant's remaining assignments of error.