BRYANT, Judge.
 

 *308
 
 Where decedent's statements were admitted at trial for the primary purpose of obtaining a medical diagnosis, and not for the primary purpose of creating an out-of-court substitute for trial testimony, the Confrontation Clause of the Sixth Amendment is satisfied, and the trial court committed no error. Additionally, the trial court did not err in admitting out-of-court statements under the excited utterance exception to the hearsay rule. Finally, we find no plain error where the trial court admitted relevant testimony, and where there was otherwise overwhelming evidence to support the jury verdict.
 

 Defendant sexually molested the victim, Preston,
 
 [1]
 
 over a period of approximately five to six years, starting when the victim was about nine or ten years old and ending when he was fifteen. Defendant did so at Preston's home, at defendant's home, and when taking Preston on outings and vacations to various places.
 

 Preston was born on 22 August 1994 and was one of seven children. Preston's mother, Rebekah, described Preston at trial as a smart, funny, and caring child, who changed when he was approximately nine years old, in that he became sadder and anxious and began to isolate himself.
 

 Rebekah met defendant while he was serving time in the same prison as her brother at the Quincy Correctional Institution in Tallahassee, Florida. Upon his release, defendant developed a close relationship with Preston's family and became known as "Uncle Doug." Beginning in 2003 or 2004, defendant took Preston several places, including trips to baseball games in Florida; to Massachusetts, Vermont, and Pennsylvania; to places in the North Carolina mountains for snowboarding; and to Daytona, Florida during Preston's spring breaks.
 

 *309
 
 Defendant first sexually molested Preston after taking him to a baseball game in 2003 or 2004, when Preston was approximately nine years old. At that time, defendant gave Preston alcohol and touched him on his private parts. Starting when Preston was ten, defendant engaged Preston in oral sex, and starting when Preston was twelve, defendant began having anal sex with Preston. Defendant bought Preston anything he wanted, including video game consoles, a television, snowboarding gear, and clothing, as bribes for performing sex acts with defendant.
 

 In July 2008, when Preston was thirteen, he and his family moved to Concord, North Carolina. That same year, defendant lost his job and his home. Beginning in March 2009, Rebekah allowed defendant to live with her family, helped him look for jobs, and assisted him financially. While living with Preston and his family, defendant helped care for Preston and continued to take him on trips. During some period of the time defendant lived with Preston's family, he shared a room with Preston. According to Rebekah, in October 2009, Preston indicated that he did not want defendant living in the house. In the fall or winter of 2009, defendant moved out but continued to take Preston on trips.
 

 On 5 March 2010, defendant took Preston on a trip to Florida during his spring break. The night before, on 4 March 2010, defendant engaged Preston in performing fellatio. On their way to Florida, defendant and Preston spent the night in Brunswick, Georgia, where defendant attempted anal intercourse with Preston, but was unable to do so. From Brunswick, defendant and Preston traveled to Tampa, Florida. Thereafter, Preston
 
 *274
 
 spent the remainder of his spring break with his father in southern Georgia.
 

 While staying with his father, Preston emailed his father and told him about the abuse, but his father did not check his email before Preston returned to North Carolina with defendant. On 14 March 2010, while Preston was riding home with defendant, he texted his mother: "As soon as I get home, we need to go for a drive." Rebekah explained that this was code that an important issue needed to be discussed privately. According to Rebekah, when Preston arrived home, he rushed into her room and told her, "We got to go now." At trial, Rebekah testified that when she and Preston went for their drive, he was very shaken and upset, and he seemed very nervous and scared. Upon being prompted by Rebekah, Preston told her that defendant had been "touching [him] inappropriately on [his] private parts and-more." Rebekah and Preston were both crying. When Rebekah asked what "more" meant, Preston told her that it meant he and defendant had oral sex. Preston also told
 
 *310
 
 Rebekah that defendant told Preston he would kill him and his entire family if he disclosed any of the abuse.
 

 Worried about Preston as well as about her other children who were at home with defendant at the time, Rebekah drove to the Concord Police Department, where she and Preston spoke with Detective Carlos Landers, who was assigned to investigate the case. Detective Landers then went to Preston's home and told defendant that the family wanted him to leave. Defendant complied and voluntarily went to the police department where he spoke with Detective Landers.
 

 On 26 March 2010, Preston had an appointment at the Children's Advocacy Center ("CAC"), a department of the Jeff Gordon Children's Hospital in Carrabus County. CAC staff met with Preston to conduct a medical interview and give him a complete medical evaluation. Registered nurse Martha Puga conducted the interview portion of Preston's evaluation, which she videotaped. The recording became part of Preston's medical file. A DVD copy and transcript of Preston's interview were entered into evidence at trial over defendant's objection. During his interview with Nurse Puga, Preston recounted, among other things, details of the sexual abuse inflicted upon him by defendant, places where defendant molested him, and things defendant bought him in exchange for performing sex acts. Preston also told Nurse Puga that he was afraid of defendant, noting that when defendant got mad, he would become extremely violent and throw things across the room, and that on a few occasions, defendant picked Preston up by the hair and threw him on the bed.
 

 The doctor who performed Preston's medical examination, Rosolena Conroy, M.D., testified at trial that an abused child's biggest fear is of the perpetrator and that, more specifically, the child fears the perpetrator will hurt him. Dr. Conroy noted that delayed disclosure of abuse was very common as, in order to make disclosures of sexual abuse, victims must overcome fear, obligation, guilt, and shame. She also testified that a disproportionately high number of child victims of sexual abuse go on to commit suicide and that these children experience a greater risk of abusing drugs and alcohol.
 

 Dr. Conroy testified that it was her practice to first speak to the nurse about the history the nurse obtains, then to do a complete physical examination of the child. Dr. Conroy's assessment of Preston showed that his history was "extremely clear, concise, and detailed." Dr. Conroy testified that Preston's physical exam was normal, which was not surprising and
 
 *311
 
 "very, very common." According to her, the lack of physical findings "did not negate his clear history of repeated sexual abuse."
 

 On 19 April 2010, warrants were issued for defendant's arrest, charging him with five counts of statutory sexual offense and two counts of taking indecent liberties with a minor. However, they were not served on him until 30 March 2011 because defendant had left the State and gone to Florida. Defendant was indicted on 11 April 2011 for five counts of statutory sex offense and for two counts of taking indecent liberties with a minor.
 

 *275
 
 After Preston made his disclosure of sexual abuse, he began having night terrors and punching holes in the walls. He kept knives under his bed and bats strategically placed around his room. Rebekah sought treatment for Preston at various facilities. Issues regarding Preston which Rebekah wanted addressed included (1) a suicide attempt by Preston; (2) physical violence at home (punching holes in the walls); (3) stealing from his parents; (4) loss of academic potential; (5) hanging around "drug people"; (6) sneaking out; (7) verbal abuse at home; (8) getting kicked out of school; (9) self-injurious behavior, such as cutting; and (10) criminal activity and legal problems, including a misdemeanor charge for possession of drug paraphernalia which was ultimately dismissed because of Preston's age.
 

 In April 2010, Rebekah took Preston to see a licensed professional counselor, Susan Sikes, who saw him until April 2011. Sikes testified, among other things, that Preston indicated that he was sexually abused from age nine to fifteen, that it occurred for six years, and that it was the most significant trauma he had ever faced. Sikes also testified that Preston had checked "suicidal ideation" on his intake form and that he told her about one suicide attempt where he ingested white powder from a fluorescent light bulb.
 

 In June 2012, when Preston was seventeen, Rebekah enrolled him in two in-patient facilities, the last of which was in California. There, the resident psychologists specialized in trauma and focused their treatment of Preston on his sexual abuse. After thirty days in the facility, on 6 July 2012, Preston committed suicide by hanging himself.
 

 On 25 April 2014, a pretrial hearing was held regarding the State's motion to admit the victim's videotaped CAC interview and statements the victim made to his mother. Defendant objected based on hearsay and Confrontation Clause grounds. On 31 July 2014, the trial court entered a written order, ruling that the victim's videotaped statements
 
 *312
 
 and statements to his mother would be admitted as exceptions to the hearsay rule.
 

 The case came on for trial during the 13 October 2014 session of Cabarrus County Superior Court, the Honorable Jeffrey P. Hunt, Judge presiding. In addition to evidence of sexual abuse, the State submitted evidence that Preston committed suicide. Sikes testified about peer-reviewed articles and studies which indicated that there was a correlation between suicide and sexual abuse, that the risk of suicide increases with male victims, that the risk also increases with penetration, and that the risk is even higher when the perpetrator is a friend, family member, or person close to the victim. Sikes testified that based upon her experience and research Preston's disclosure of sexual abuse "certainly could be a factor in his suicide."
 

 Preston's younger half-brother, Jonah,
 
 [2]
 
 also testified at trial that on three occasions defendant touched his penis by wrapping his fingers around it and moving his hand up and down. After the second time, defendant told Jonah that if he told anyone about what happened, defendant would hurt him. Jonah did not tell anyone at the time the abuse happened because he believed defendant's threats and was scared.
 

 Defendant testified at trial on his own behalf and denied that he at any time threatened Preston or engaged in any sexual activity with or inappropriate touching of Preston or his half-brother Jonah.
 

 On 22 October 2014, the jury found defendant guilty on all counts. As a prior record level IV, the trial court sentenced defendant to consecutive sentences of a minimum of 339 months and a maximum of 416 months for each of the five counts of statutory sex offense. Defendant was sentenced to a minimum of 25 months and a maximum of 30 months on each of the two counts of taking indecent liberties with a minor, to run consecutively with the statutory sex offense sentences. The trial court found that defendant was convicted of a criminal offense requiring sex-offender registration and imposed satellite-based monitoring for a period of thirty
 
 *276
 
 years after his release from prison. Defendant appeals.
 

 _________________________
 

 On appeal, defendant argues that (I) allowing the jurors to use Preston's CAC interview in lieu of live testimony violated defendant's constitutional right to confrontation; (II) the trial court erred when it
 
 *313
 
 admitted Preston's statements to his mother under the excited utterance exception to the hearsay rule; and (III) the trial court erred when it denied defendant's motion to exclude the State from introducing evidence linking the suicide of Preston to acts of defendant.
 

 I
 

 Defendant first argues that his constitutional right to confront his accuser was violated when the trial court allowed into evidence Preston's interview at the CAC in lieu of his live testimony. Specifically, defendant complains that the CAC interview violates the Confrontation Clause because the "primary purpose" of Preston's CAC interview was to verify abuse for the purpose of later prosecution and was, therefore, testimonial and inadmissible hearsay evidence. We disagree.
 

 The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "The right to confront one's accusers is a concept that dates back to Roman times[,]" but the roots of the Sixth Amendment are generally traced back to English common law.
 
 Crawford v. Washington,
 

 541 U.S. 36
 
 , 43,
 
 124 S.Ct. 1354
 
 , 1359,
 
 158 L.Ed.2d 177
 
 , 187 (2004) (citations omitted). Upon its inception, the Sixth Amendment was primarily geared towards "prevent[ing] depositions or
 
 ex parte
 
 affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness...."
 
 Mattox v. United States,
 

 156 U.S. 237
 
 , 242,
 
 15 S.Ct. 337
 
 , 339,
 
 39 L.Ed. 409
 
 , 411 (1895) ;
 
 see also
 

 Crawford,
 

 541 U.S. at 43-50
 
 ,
 
 124 S.Ct. at 1360-64
 
 ,
 
 158 L.Ed.2d at 187-92
 
 (providing a thorough historical background of the Confrontation Clause);
 
 State v. Webb,
 

 2 N.C. 103
 
 , 103-04 (Super.L. & Eq.1794) (per curiam) (holding that where defendant was on trial for horse-stealing depositions taken in his absence were not permitted to be read against him: "no man shall be prejudiced by evidence which he had not the liberty to cross examine").
 

 With regard to the advent of the hearsay rule, "[b]etween 1700 and 1800 the rules regarding the admissibility of out-of-court statements were still being developed."
 
 Crawford,
 

 541 U.S. at 73
 
 ,
 
 124 S.Ct. at 1377
 
 ,
 
 158 L.Ed.2d at 206
 
 . Even Justice Scalia, the author of the majority opinion in
 
 Crawford
 
 and well-known for his originalist position when it comes to constitutional interpretation, acknowledged that "[t]here were always exceptions to the general rule of exclusion.... It is one thing to trace the right of confrontation back to the Roman Empire; it is quite another to conclude that such a right absolutely excludes a large category of evidence."
 

 Id.
 

 Indeed,
 

 *314
 
 [e]xceptions to confrontation have always been derived from the experience that some out-of-court statements are just as reliable as cross-examined in-court testimony due to the circumstances under which they are made.... [F]or example, ... [b]ecause [co-conspirator] statements are made while the declarant and accused are partners in an illegal enterprise, the statements are unlikely to be false and their admission actually furthers the Confrontation Clause's very mission which is to advance the accuracy of the truth-determining process in criminal trials.... Similar reasons justify the introduction of ...
 
 statements made in the course of procuring medical services
 
 .... That a statement might be testimonial does nothing to undermine the wisdom of one of these exceptions.
 

 Id.
 

 at 74
 
 ,
 
 124 S.Ct. at 1377
 
 ,
 
 158 L.Ed.2d at 206-07
 
 (emphasis added) (internal citations and quotation marks omitted).
 

 While it is well-established that there is "wisdom" to these hearsay exceptions,
 
 see
 
 id.,
 

 it is similarly settled that, while "the Confrontation Clause and rules of hearsay may protect similar values, it would be an erroneous simplification to conclude that the
 
 *277
 
 Confrontation Clause is merely a codification of hearsay rules."
 
 State v. Jackson,
 

 348 N.C. 644
 
 , 649,
 
 503 S.E.2d 101
 
 , 104 (1998) (citing
 
 California v. Green,
 

 399 U.S. 149
 
 , 155,
 
 90 S.Ct. 1930
 
 , 1933,
 
 26 L.Ed.2d 489
 
 , 495 (1970) ). "Evidence admitted under an exception to the hearsay rule may still violate the Confrontation Clause."
 

 Id.
 

 (citation omitted);
 
 see also
 

 Crawford,
 

 541 U.S. at 51
 
 ,
 
 124 S.Ct. at 1364
 
 ,
 
 158 L.Ed.2d at 192
 
 ("[
 
 E]x parte
 
 examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.").
 

 At the same time, the U.S. Supreme Court in
 
 Crawford
 
 did acknowledge that "[t]he [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."
 
 541 U.S. at
 
 59 n. 9,
 
 124 S.Ct. at
 
 1369 n. 9,
 
 158 L.Ed.2d at
 
 198 n. 9 (citing
 
 Tennessee v. Street,
 

 471 U.S. 409
 
 , 414,
 
 105 S.Ct. 2078
 
 , 2081,
 
 85 L.Ed.2d 425
 
 , 431 (1985) );
 
 State v. Ortiz-Zape,
 

 367 N.C. 1
 
 , 6,
 
 743 S.E.2d 156
 
 , 160 (2013) (quoting
 
 Crawford
 
 ). In doing so,
 
 Crawford
 
 recognized that most of the exceptions to the hearsay rule cover statements that by their nature are not testimonial and, therefore, do not present a Confrontation Clause problem.
 
 541 U.S. at 56
 
 ,
 
 124 S.Ct. at 1367
 
 ,
 
 158 L.Ed.2d at 195-96
 
 ("[T]here is scant evidence that [hearsay] exceptions were invoked to admit
 
 testimonial
 
 statements against the accused in a
 
 criminal
 
 case. Most of the hearsay exceptions covered statements that by their nature were not testimonial-for
 
 *315
 
 example, business records or statements in furtherance of a conspiracy." (footnote omitted)).
 

 Moving beyond a historical or literal interpretation of the Confrontation Clause, the U.S. Supreme Court, for decades before its decision in
 
 Crawford,
 
 had consistently conceptualized the Sixth Amendment as a substantive guarantee of the reliability of evidence.
 
 See, e.g.,
 

 Ohio v. Roberts,
 

 448 U.S. 56
 
 , 66,
 
 100 S.Ct. 2531
 
 , 2539,
 
 65 L.Ed.2d 597
 
 , 608 (1980) ("[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.");
 
 Idaho v. Wright,
 

 497 U.S. 805
 
 , 819-20,
 
 110 S.Ct. 3139
 
 ,
 
 111 L.Ed.2d 638
 
 , 655 (1990) (holding that hearsay evidence admitted under the Confrontation Clause's "particularized guarantees of trustworthiness" requirement must be so trustworthy that cross-examination of declarant would be of marginal utility). It was not until the U.S. Supreme Court's opinion in
 
 Crawford
 
 that a defendant's right to confront his accuser was treated as a procedural requirement:
 

 To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.
 

 541 U.S. at 61
 
 ,
 
 124 S.Ct. at 1370
 
 ,
 
 158 L.Ed.2d at 199
 
 (citations omitted).
 

 While
 
 Crawford
 
 acknowledges that the "ultimate goal" of the Confrontation Clause is to ensure reliability, it nevertheless mandates strict adherence to the black letter of the Clause itself when testimonial, out-of-court statements are at issue, requiring that "[t]estimonial statements of witnesses absent from trial [be] admitted only where the declarant is
 
 unavailable,
 
 and only where the defendant has had a
 
 prior opportunity to cross-examine.
 
 "
 

 Id.
 

 at 59
 
 ,
 
 124 S.Ct. at 1369
 
 ,
 
 158 L.Ed.2d at
 
 197 ;
 
 see also
 

 State v. Jackson,
 

 216 N.C.App. 238
 
 , 241,
 
 717 S.E.2d 35
 
 , 38 (2011) (citation omitted) ("The elements of confrontation include the witness's: physical presence; under-oath testimony; cross-examination; and exposure of his demeanor to the jury."). Accordingly, Confrontation Clause analysis begins with a determination of whether or not an out-of-court
 
 *316
 
 statement is testimonial or nontestimonial.
 
 See
 

 Crawford,
 

 541 U.S. at 68
 
 ,
 
 124 S.Ct. at 1368
 
 ,
 
 158 L.Ed.2d at 203
 
 .
 
 *278
 
 "[W]hen the hearsay statement at issue [is] not testimonial," the U.S. Supreme Court has "considered reliability factors beyond prior opportunity for cross-examination...."
 

 Id.
 

 at 57
 
 ,
 
 124 S.Ct. at 1368
 
 ,
 
 158 L.Ed.2d at
 
 196 (citing
 
 Dutton v. Evans,
 

 400 U.S. 74
 
 , 87-89,
 
 91 S.Ct. 210
 
 , 219-220,
 
 27 L.Ed.2d 213
 
 , 226-27 (1970) (plurality opinion)). However, "[w]here testimonial statements are involved, ... the Framers [did not mean] to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' "
 
 Id.
 
 at 61,
 
 124 S.Ct. at 1370
 
 ,
 
 158 L.Ed.2d at 199
 
 .
 

 Unfortunately,
 
 Crawford
 
 declined to go any further in clarifying the precise difference between testimonial and nontestimonial statements for purposes of Confrontation Clause analysis other than stating as follows:
 

 Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does [
 
 Ohio v.] Roberts,
 
 and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.
 

 Id.
 

 at 68
 
 ,
 
 124 S.Ct. at 1374
 
 ,
 
 158 L.Ed.2d at 203
 
 (footnote omitted). Indeed, the U.S. Supreme Court, on "another day," did further define testimonial statements, although in the limited context of statements made to police officers:
 

 Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation
 
 *317
 
 is to establish or prove past events potentially relevant to later criminal prosecution.
 

 Davis v. Washington,
 

 547 U.S. 813
 
 , 822,
 
 126 S.Ct. 2266
 
 , 2273-74,
 
 165 L.Ed.2d 224
 
 , 237 (2006). However, the existence of an ongoing emergency is not dispositive to the issue of whether the statement is testimonial in nature.
 
 Michigan v. Bryant,
 

 562 U.S. 344
 
 , 366,
 
 131 S.Ct. 1143
 
 , 1160,
 
 179 L.Ed.2d 93
 
 , 112 (2011). Rather, "whether an ongoing emergency exists is simply one factor-albeit an important factor-that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation."
 

 Id.
 

 Most recently, the U.S. Supreme Court has proceeded to establish the test for statements made to individuals who are not law enforcement officers: "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' "
 
 Ohio v. Clark,
 
 ---U.S. ----, ----,
 
 135 S.Ct. 2173
 
 , 2180,
 
 192 L.Ed.2d 306
 
 , 315 (2015) (alteration in original) (quoting
 
 Bryant,
 

 562 U.S. at 358
 
 ,
 
 131 S.Ct. at 1155
 
 ,
 
 179 L.Ed.2d at
 
 107 ). In determining the "primary purpose" of the conversation, "[c]ourts must evaluate challenged statements in context, and part of that context is the questioner's identity."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 2182
 
 ,
 
 192 L.Ed.2d at 317
 
 (citation omitted);
 
 see also
 

 State v. Lewis,
 

 360 N.C. 1
 
 , 21,
 
 619 S.E.2d 830
 
 , 843 (2005) (stating that "an additional prong of the analysis for determining whether a statement is 'testimonial' is, considering the surrounding circumstances, whether a reasonable person in the declarant's position would know or should have known his or her statements would be used at a subsequent trial" and that "[t]his determination is to be measured by an objective, not subjective, standard"),
 
 vacated and remanded,
 

 Lewis v. North Carolina,
 

 548 U.S. 924
 
 ,
 
 126 S.Ct. 2983
 
 ,
 
 165 L.Ed.2d 985
 
 (2006) (remanding for further consideration in light of
 
 Davis v. Washington,
 

 547 U.S. 813
 
 ,
 
 126 S.Ct. 2266
 
 ,
 
 165 L.Ed.2d 224
 
 (2006) ).
 

 *279
 
 Based on all of the foregoing-from the history of the Confrontation Clause, rooted in Roman times and the English common law, to the Clause's shifting jurisprudence in the U.S. Supreme Court's opinions in
 
 Crawford
 
 (holding that reliability must be assessed by "testing in the crucible of cross-examination"),
 
 Davis
 
 (defining when statements to law enforcement are "testimonial"), and
 
 Clark
 
 (prohibiting out-of-court statements introduced for the primary purpose of providing a substitute for in-court testimony)-we conclude that the Confrontation Clause should not be read to categorically require confrontation in all cases; rather, in determining what the Clause does require, the underlying purpose of the Clause should be at the beginning and the end of the analysis.
 

 *318
 
 The underlying purpose of the Confrontation Clause is to ensure the reliability of evidence and to facilitate the fact-finding function of the trial court. It is this purpose-ensuring the reliability of evidence-that should be at the forefront of the analysis. This is especially true in cases of child sexual abuse, where children are often incompetent or (as in this case) unavailable to testify. The purpose of the Confrontation Clause should not be subverted by such strict adherence to its language regarding "confrontation" where the purpose of the Clause is otherwise satisfied.
 

 "The physical presence, or 'face-to-face,' requirement embodies the general Confrontation Clause protection of an accused's 'right [to] physically face those who testify against him.' "
 
 Jackson,
 

 216 N.C.App. at 241
 
 ,
 
 717 S.E.2d at 38
 
 (alteration in original) (quoting
 
 Pennsylvania v. Ritchie,
 

 480 U.S. 39
 
 , 51,
 
 107 S.Ct. 989
 
 , 998,
 
 94 L.Ed.2d 40
 
 , 53 (1987) ). "But, this general rule 'must occasionally give way to considerations of public policy and the necessities of the case.' "
 

 Id.
 

 (quoting
 
 Mattox,
 

 156 U.S. at 243
 
 ,
 
 15 S.Ct. at 340
 
 ,
 
 39 L.Ed. at
 
 411 ).
 

 Keeping in mind the ultimate goal of the Sixth Amendment, the Clause's purpose may be satisfied by taking into consideration the totality of the circumstances, including, but not limited to, the following: (1) statements which are admitted that are by their nature nontestimonial; (2) statements which fall under an exception "derived from the experience that some out-of-court statements are just as reliable as cross-examined in-court testimony due to the circumstances under which they were made," like those made for the purpose of medical diagnosis or treatment,
 
 see
 

 Crawford,
 

 541 U.S. at 74
 
 ,
 
 124 S.Ct. at 1377
 
 ,
 
 158 L.Ed.2d at
 
 206 ; (3) to whom the out-of-court statement was made,
 
 see
 

 Clark,
 
 --- U.S. at ----,
 
 135 S.Ct. at 2182
 
 ,
 
 192 L.Ed.2d at
 
 317 ;
 
 Davis,
 

 547 U.S. at 822
 
 , 126 S.Ct. at 2273, 165 L.Ed.2d at 237 ; (4) the "primary purpose" for which the out-of-court statement was made,
 
 see
 

 Bryant,
 

 562 U.S. at 366
 
 ,
 
 131 S.Ct. at 1160
 
 ,
 
 179 L.Ed.2d at
 
 112 ; (5) the primary purpose for which the out-of-court statement is offered at trial,
 
 see
 

 Clark,
 
 --- U.S. at ----,
 
 135 S.Ct. at 2181
 
 ,
 
 192 L.Ed.2d at
 
 316 ; and (6) public policy concerns, i.e., "balanc[ing] the need for child sex crime victims' testimony against the risk of engendering further emotional distress."
 
 Jackson,
 

 216 N.C.App. at 241
 
 ,
 
 717 S.E.2d at 38
 
 (citation omitted);
 
 see also
 

 Maryland v. Craig,
 

 497 U.S. 836
 
 , 852-53,
 
 110 S.Ct. 3157
 
 , 3167,
 
 111 L.Ed.2d 666
 
 , 683 (1990) (deeming the interest in safeguarding child abuse victims from further trauma to be a compelling one that, depending on the necessities of the case, may outweigh a defendant's right to face his accusers in court). None of the aforementioned considerations should be considered dispositive; rather, they should inform the court's analysis in keeping with the true guarantee of the Confrontation Clause-to ensure the trustworthiness of the evidence presented to the court and the jury.
 

 *319
 
 Returning to defendant's argument-that his constitutional right to confront his accuser was violated when the trial court allowed into evidence Preston's CAC interview in lieu of his live testimony-we directly address, as a threshold matter, the State's argument that defendant failed to preserve this issue for appeal.
 

 At the conclusion of the 25 April 2014 hearing on the admissibility of the victim's videotaped CAC interview, the trial court, with consent of the parties, reserved final ruling on the hearsay and Confrontation
 
 *280
 
 Clause issues presented. Instead, the court limited its ruling because the judge presiding over the hearing, the Honorable C.W. Bragg, was not certain he would be the judge presiding at trial. In fact, the Honorable Jeffrey P. Hunt presided over the trial.
 

 Despite defendant's arguments during the 25 April 2014 pretrial conference regarding defendant's Sixth Amendment rights and objections to the admission of the CAC interview as testimonial evidence in a written order dated 31 July 2014, the trial court ruled that it was admissible as a statement made for medical diagnosis or treatment. The written order ruled on the hearsay argument but not on any Confrontation Clause grounds.
 

 At trial, defendant renewed his objections to the CAC interview: "I would ask the Court to note my objection. I'd rest on my previous arguments and any arguments I've made subsequent to the Court that have been recorded in our previous discussion outside the presence of the jury."
 

 The State argues, although on different grounds, that defendant failed to preserve his Confrontation Clause argument for appeal. Specifically, the State argues that defendant waived review of the Confrontation Clause issue by failing to obtain a ruling pursuant to N.C. R. App. 10(a)(1) (2013). While defendant never obtained a direct ruling on the Confrontation Clause argument from the trial court, because defendant made proper objections at the pretrial conference and again at trial, and because the testimony was allowed over defendant's objection, we determine the issue was properly preserved for appeal.
 

 Proceeding to the merits of defendant's argument, defendant contends that the trial court's admission of the CAC interview under the medical diagnosis or treatment exception to the hearsay rule violated his constitutional right to confrontation and further that Preston's statements made to Nurse Puga were testimonial, inadmissible hearsay in light of her mandatory duty to report child abuse under North Carolina law. [R. at 39]. We disagree.
 

 *320
 
 "The standard of review for alleged violations of constitutional rights is
 
 de novo.
 
 "
 
 State v. Graham,
 

 200 N.C.App. 204
 
 , 214,
 
 683 S.E.2d 437
 
 , 444 (2009) (citation omitted).
 

 N.C. Gen.Stat. § 8C-1, Rule 803(4), states as follows:
 

 (4)
 
 Statements for Purposes of Medical Diagnosis or Treatment
 
 -Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
 

 N.C. Gen.Stat. § 8C-1, Rule 803(4) (2015). "The test to determine whether statements are admissible under Rule 803(4) is a two-part test: '(1) whether the declarant's statements were made for purposes of medical diagnosis or treatment; and (2) whether the declarant's statements were reasonably pertinent to diagnosis or treatment.' "
 
 State v. Burgess,
 

 181 N.C.App. 27
 
 , 35,
 
 639 S.E.2d 68
 
 , 74 (2007) (quoting
 
 State v. Hinnant,
 

 351 N.C. 277
 
 , 284,
 
 523 S.E.2d 663
 
 , 667 (2000) ) (finding the defendant's
 
 Crawford
 
 argument unpersuasive where child sex abuse victims' videotaped interviews were admitted at trial and where each took the stand and was available for cross-examination). "Testimony meeting this test is considered inherently reliable because of the declarant's motivation to tell the truth in order to receive proper treatment."
 

 Id.
 

 (citation omitted) (internal quotation marks omitted). The proponent of such testimony must establish "that the declarant made the statements understanding that they would lead to medical diagnosis or treatment."
 

 Id.
 

 (citation omitted).
 

 Notably, in an opinion following
 
 Crawford,
 
 this Court held that a young child's statements to medical personnel regarding sexual abuse were not testimonial and the defendant's confrontation rights were not violated where the child was deemed unavailable to testify pursuant to N.C. Gen.Stat. § 8C-1, Rule 804(b)(5).
 
 State v. Brigman,
 

 178 N.C.App. 78
 
 , 87-88, 91,
 
 632 S.E.2d 498
 
 , 505-07 (2006). In "considering the surrounding circumstances," this Court in
 
 Brigman
 
 held that it could not "conclude that a reasonable
 
 *281
 
 child under three years of age would know or should know that his statements might later be used at trial."
 
 Id.
 
 at 90-91,
 
 632 S.E.2d at 506
 
 .
 

 Even where, as here, the child is older (fifteen), an objective determination of this record does not lead to the assumption that the victim might reasonably be expected to "know that his statements might later
 
 *321
 
 be used at trial."
 
 See
 

 id.
 
 at 91,
 
 632 S.E.2d at 506
 
 . It is particularly this Court's "consider [ation of] the surrounding circumstances" that is significant to its Confrontation Clause analysis in light of
 
 Crawford.
 

 Id.
 
 at 90-91,
 
 632 S.E.2d at 506-07
 
 . In other words, "considering the surrounding circumstances" in the instant case not only includes looking at the age of the declarant, but also examining other factors, such as the primary purpose for which the statements were made.
 
 See
 
 id.
 

 Here, Nurse Puga's questions in the CAC interview reflected the primary purpose of attending to the victim's physical and mental health and his safety: she explained to Preston that he was there for a checkup; she asked Preston if he had any health issues, took medicine, had had any accidents, broken bones, scars, surgeries, hospitalizations, or infections. She emphasized to Preston the importance of knowing what had happened from beginning to end so they could make sure he did not have any diseases or other issues that could affect him for the rest of his life.
 

 Defendant complains that some of the questions asked, such as the importance of telling the truth, were not pertinent to medical diagnosis or treatment. However, these questions were crucial to establishing a rapport with the victim and impressing upon him the need to be open and honest about very personal and likely embarrassing details pertinent to his well-being. Likewise, having the victim relate the details from beginning to end helped the medical practitioners to evaluate the extent of the mental and physical trauma to which the victim was exposed, inquire as to whether the victim was out of danger, and discover whether other abusers or victims may have been involved.
 
 [3]
 
 Similar to instances where the "statements occurred in the context of an ongoing emergency involving suspected child abuse[,]"
 
 Clark,
 
 --- U.S. at ----,
 
 135 S.Ct. at 2181
 
 ,
 
 192 L.Ed.2d at 315
 
 , here, the detailed statements were necessary to determine the extent to which it was medically necessary to protect the victim's physical and mental health, or to protect someone else from child sexual abuse. Accordingly, the statements were not inadmissible hearsay, and the trial court did not err in admitting the CAC interview into evidence under the medical diagnosis and treatment exception to the hearsay rule.
 

 Defendant also argues that because all North Carolinians have a mandatory duty to report suspected child abuse to the Department of Social Services ("DSS"),
 
 see
 
 N.C. Gen.Stat. § 7B-301 (2015), Preston's
 
 *322
 
 statements in the CAC interview are testimonial in nature and were made for the primary purpose of later prosecution. Defendant reaches the categorical conclusion that, because of the mandatory reporting law, "[w]hen questioning a child about suspected abuse, the Child Advocacy Center employee acts in a dual capacity as a health worker and as an agent of the state for law-enforcement purposes." We disagree.
 

 In
 
 Clark,
 
 the defendant unsuccessfully argued that a three-year-old child's out-of-court statements made to his preschool teacher were testimonial in light of the teacher's mandatory duty to report child abuse to authorities under Ohio law.
 
 [4]
 
 - -- U.S. at ----,
 
 135 S.Ct. at 2182
 
 ,
 
 192 L.Ed.2d at 317
 
 . The U.S. Supreme Court in
 
 Clark
 
 has summarily rejected this argument: "[M]andatory reporting statutes alone cannot convert a conversation
 
 *282
 
 between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for prosecution."
 

 Id.
 

 ("[The defendant] emphasizes Ohio's mandatory reporting obligations, in an attempt to equate [the victim's] teachers with the police and their caring questions with official interrogations. But the comparison is inapt.... It is irrelevant that the teachers' questions and their duty to report the matter had a natural tendency to result in [the defendant's] prosecution.").
 

 Thus, the mere fact that CAC employees have a mandatory duty to report suspected child abuse does not transform the primary purpose of the CAC interview into one intended to create an out-of-court substitute for trial testimony.
 
 [5]
 
 Rather, all of the factors here and discussed previously indicate that the primary purpose of the interview was to
 
 *323
 
 safeguard the mental and physical health of the child, and not for creating a substitute for in-court testimony.
 

 Defendant also maintains that Nurse Puga's knowledge that her interview would be turned over to the police, as well as some of the questions she asked, reflect an interrelationship between the CAC and law enforcement. Again, this is not the test. The test is whether the interviewer's primary purpose was to create a substitute for in-court testimony.
 
 See
 

 id.
 

 at ----,
 
 135 S.Ct. at 2180
 
 ,
 
 192 L.Ed.2d at 314
 
 . Here, Nurse Puga is a health-care practitioner, not a person principally charged with uncovering and prosecuting criminal behavior. "Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 2182
 
 ,
 
 192 L.Ed.2d at 317
 
 (citation omitted).
 

 Here, as in
 
 Clark,
 
 "[a]t no point did [Nurse Puga] inform [Preston] that his answers would be used to arrest or punish his abuser."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 2181
 
 ,
 
 192 L.Ed.2d at 316
 
 . Furthermore, it was not anticipated that the declarant would not be available to testify at trial, not to mention the tragic circumstances that caused his unavailability. In fact, the record is replete with references to Preston's general eloquence and intelligence, and it is not likely that he would have been declared incompetent to testify at trial, particularly considering his age and understanding of the importance of telling the truth.
 
 Cf.
 

 State v. Waddell,
 

 351 N.C. 413
 
 , 421-22,
 
 527 S.E.2d 644
 
 , 650 (2000) (noting that child victim of sexual abuse was incompetent to testify at trial where he did not understand the need to tell the truth).
 

 Defendant maintains that an analysis of the primary purpose of the CAC interview must begin with who sent the victim to the CAC. Contrary to defendant's assumptions about the relevance of the referral,
 
 *324
 
 Dr. Conroy, who conducted Preston's medical exam following Nurse Puga's interview, expressly
 
 *283
 
 testified that regardless of who makes the referral, she is still going to assess the whole child and obtain the same information; that her examination is not law-enforcement-driven in any way; that the CAC receives referrals from many sources, and often gets multiple referrals; that while in this particular case, she recalled law enforcement making the referral, this did not change the examination.
 

 Defendant's constitutional argument fails where circumstances objectively reflect that (1) the primary purpose of the CAC interview was to promote the victim's health and well-being; (2) the statements were made to a nurse, not law enforcement, notwithstanding the nurse's mandatory duty to report suspected abuse to law enforcement; (3) the statements were not intended primarily for purposes of prosecution; and (4) the CAC interview was admitted under an exception for statements made in the course of obtaining medical diagnosis or treatment-the wisdom of which has been long recognized.
 
 See
 

 Crawford,
 

 541 U.S. at 74
 
 ,
 
 124 S.Ct. at 1377
 
 ,
 
 158 L.Ed.2d at 206
 
 . Accordingly, defendant's arguments are overruled.
 

 II
 

 Defendant next argues that the trial court erred in admitting Preston's 14 March 2010 statements to his mother under the excited utterance hearsay exception, arguing instead that the statements were inadmissible hearsay. We disagree.
 

 "The trial court's determination as to whether an out-of-court statement constitutes hearsay is reviewed de novo on appeal."
 
 State v. Castaneda,
 

 215 N.C.App. 144
 
 , 147,
 
 715 S.E.2d 290
 
 , 293, (2011) (citation omitted).
 

 Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen.Stat. § 8C-1, Rule 801(c) (2015). The excited utterance hearsay exception allows admission of out-of-court statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.C. Gen.Stat. § 8C-1, Rule 803(2) (2015). To qualify as an excited utterance, the statement must relate to "(1) a sufficiently startling experience suspending reflective thought and (2)[be] a spontaneous reaction, not one resulting from reflection or fabrication."
 
 State v. Maness,
 

 321 N.C. 454
 
 , 459,
 
 364 S.E.2d 349
 
 , 351 (1988) (citation omitted). Additionally, "[a]lthough the requirement for spontaneity is often measured in terms of the time lapse between the startling event and the
 
 *325
 
 statement, ... the modern trend is to consider whether the delay in making the statement provided an opportunity to manufacture or fabricate the statement."
 
 State v. Smith,
 

 315 N.C. 76
 
 , 87,
 
 337 S.E.2d 833
 
 , 841 (1985) (citation omitted) (internal quotation marks omitted).
 

 Defendant argues that Preston's disclosure to his mother does not fall within the excited utterance hearsay exception as it was a product of reflective thought. Defendant argues that because there was a ten-day gap between the last incident of sexual abuse on 4 March 2010 and Preston's statements to Rebekah on 14 March 2010, Preston had time for reflective thought. We disagree.
 

 At the 25 April 2014 pretrial hearing, the trial court examined the admissibility of Preston's 14 March 2010 statements to Rebekah made immediately upon returning to Florida. Rebekah testified that when Preston arrived home with defendant, Preston came into the house "frantically" and was "shaking" while telling her, "You got to call the police right now." According to Rebekah, when she asked Preston, "Why? For what? What's wrong," Preston said, "It's [defendant]." Rebekah stated that she and Preston "got right in the car, and he told her right away" about the abuse. The trial court issued a detailed order concluding Preston's statements to Rebekah were admissible as excited utterances and, alternatively, could be used to corroborate his statements to Nurse Puga.
 

 The excited utterance exception applies after a delay typically in cases involving young children, as "the stress and spontaneity upon which the exception is based is often present for longer periods of time in young children than adults."
 

 Id.
 

 (citation omitted);
 

 *284
 

 see
 

 id.
 
 at 88,
 
 337 S.E.2d at 842
 
 (granting leeway with time element where declarant/victims were four- and five-year-olds making utterances two or three days after abuse, and holding that "[s]pontaneity and stress are the crucial factors," rather than time). Additionally, the North Carolina appellate courts have granted leeway with young child victims not only because they generally lack the capacity to fabricate, but also because they "may not make immediate complaint because of threats, fear of reprisals, admonishments of secrecy, or other pressures not to disclose, particularly where ... the child had a close relationship with the offender."
 
 Id.
 
 at 89,
 
 337 S.E.2d at 842
 
 (citation omitted) (internal quotation marks omitted).
 

 The situation here is not necessarily in accord with cases granting more leeway with the time element of the excited utterance analysis because the declarants therein were children much younger than Preston, who was fifteen years old.
 
 See, e.g.,
 

 id.
 
 at 88,
 
 337 S.E.2d at 842
 
 . However, while this victim was fifteen rather than four or five years of
 
 *326
 
 age, he was nevertheless a minor and that fact should not be disregarded in the analysis.
 

 Additionally, defendant contends that because Preston first tried communicating the allegations regarding the abuse to his father via email, his later statements to his mother fall outside the range of admissible excited utterances. Specifically, defendant argues that Preston's statement to his mother was the product of reflective thought based on Preston's explanation to Nurse Puga regarding his decision to reveal the abuse:
 

 [Puga]: Okay, and tell me about what made you finally decide to, like, to disclose when you came back?
 

 [Preston]: Well, again, my dad, he's just, oh, when I came back? See, now I know, um, my dad didn't say anything about it that day because he didn't read his email, so I figured I have to tell someone right now. So I told my mom.
 

 [Puga]: And what, how did you decide this was the time to tell, to, to do something?
 

 [Preston]: She has, I mean, I hadn't had any stronger feelings about it over the last few years because, I mean, if I tell someone I'm gonna be super scared. But if I caught, you know, [defendant] whatever he is called on a good note, he wouldn't think anything's up, and, um, I figured, you know, now is the time. You know, in the military strategy there's always a time to strike.
 

 [Puga]: Uh huh.
 

 [Preston]: Well, that was the time.
 

 However, a declarant's statements can still be spontaneous, even where he previously made the same ones to a different person, as long as there was, as there was here, sufficient evidence to establish that the declarant was under the stress of a startling event and had no opportunity to fabricate.
 
 See
 

 State v. Coria,
 

 131 N.C.App. 449
 
 , 452,
 
 508 S.E.2d 1
 
 , 3 (1998) (concluding statements made to police officer by a seventeen-year-old victim of physical abuse by her father were exited utterances, even though the victim had previously made similar statements to another person). Additionally, defendant's argument that Preston's explanation demonstrated reflective thought ("in military strategy there's always a time to strike"), is unpersuasive where the trial evidence overwhelmingly established that Preston feared reprisal from
 
 *327
 
 defendant for his disclosure-as he had received threats from defendant in the past-and which undoubtedly delayed disclosure.
 

 As stated previously, until some event prompts them to disclose, children generally delay disclosure "because of threats, fear of reprisals, admonishments of secrecy, or other pressures not to disclose."
 
 Smith,
 

 315 N.C. at 89
 
 ,
 
 337 S.E.2d at 842
 
 .
 

 Defendant argues that the critical question at issue in determining the admissibility of these statements under Rule 803(2) is why Preston decided to reveal the abuse to his mother days after the last incident. However, defendant's narrow analysis of the issue does not account for the five-to-six-year pattern of sexual abuse, concluding in an incident occurring ten days prior to Preston's excited utterances. It does not account for the fact that Preston was afraid of defendant, defendant had been violent towards Preston in the past, and during the return trip home,
 
 *285
 
 defendant had been "extremely pissed" at Preston.
 

 Defendant's narrow analysis also does not account for the fact that Preston made his statements immediately upon leaving the custody of the person who had sexually abused him for the past several years.
 
 See
 

 State v. Jones,
 

 89 N.C.App. 584
 
 , 595,
 
 367 S.E.2d 139
 
 , 146 (1988) (concluding that statements by a child concerning sexual abuse were spontaneous because they were made only ten hours after child left abuser's custody),
 
 overruled on other grounds by
 

 Hinnant,
 

 351 N.C. at 287
 
 ,
 
 523 S.E.2d at 669
 
 (overruling based on the analysis in
 
 Jones
 
 regarding statements made for purposes of medical diagnosis or treatment). Ultimately, " 'the character of the transaction or event will largely determine the significance of the time factor' " in the excited utterance analysis.
 
 State v. Kerley,
 

 87 N.C.App. 240
 
 , 243,
 
 360 S.E.2d 464
 
 , 466 (1987) (quoting Rule 803(2) official commentary). Based on the foregoing analysis, we hold that Preston's statements to his mother were properly admitted under Rule 803(2) as excited utterances. Defendant's hearsay challenge is overruled.
 

 III
 

 Lastly, defendant argues that the trial court plainly erred in admitting evidence linking Preston's suicide to the sexual abuse. Specifically, defendant challenges testimony from counselor Susan Sikes regarding "the likelihood of an abused child committing suicide," and that Preston's disclosure of sexual abuse "certainly could be a factor in his suicide." Defendant argues that (1) evidence regarding Preston's suicide was not relevant, and even if relevant, was grossly prejudicial; and (2) Sikes's
 
 *328
 
 testimony did not meet the admissibility standards of amended Rule of Evidence 702(a) in that Sikes was not qualified to give that testimony.
 

 Defendant's counsel did not object to Sikes's testimony as to the link between Preston's suicide and sexual abuse. Therefore, the issue is whether introduction of her opinion constituted plain error:
 

 For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.
 

 State v. Lawrence,
 

 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012) (alteration in original) (internal citations and quotation marks omitted).
 

 Defendant argues that any evidence alluding to or linking the suicidal death of Preston to any acts of defendant was irrelevant, or alternatively, even if relevant, any probative evidence regarding the suicide was substantially outweighed by the danger of unfair prejudice.
 

 Only relevant evidence is admissible at trial. N.C. Gen.Stat. § 8C-1, Rule 402 (2015). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen.Stat. § 8C-1, Rule 401 (2015). Relevant evidence may be admissible if the probative effect of the evidence is substantially outweighed by the danger of unfair prejudice. N.C. Gen.Stat. § 8C-1, Rule 403 (2015).
 

 Preston made his allegations of sexual abuse in March 2010. Two years later he committed suicide while he was an in-patient in a medical treatment center. At the pretrial hearing, the trial court ruled on defendant's motion
 
 in limine
 
 to exclude evidence directly linking Preston's suicide to the acts of defendant, stating that "the State is prohibited in this trial, either side, from saying definitively that the suicide was caused by any particular causation."
 

 At trial, Sikes, a licensed professional counselor who counseled children and victims of sexual abuse, was offered and received as an expert in professional counseling. Sikes did not testify that Preston's
 
 *329
 
 suicide was a direct result of defendant's acts. Rather, she testified to the correlation between sexual abuse and suicidal ideation and cited to various peer-reviewed studies which found that sexually abused males are four to eleven
 
 *286
 
 times more likely to exhibit suicidal ideation and behaviors than males who have not experienced sexual abuse.
 

 Evidence of and relating to Preston's suicide was relevant in this case because, although not necessarily part of defendant's commission of the actual crime, it "form[ed] an integral and natural part of an account of the crime, [and was] necessary to complete the story of the crime for the jury."
 
 State v. Agee,
 

 326 N.C. 542
 
 , 548,
 
 391 S.E.2d 171
 
 , 174-75 (1990) (citation omitted). Furthermore, defendant cannot establish that "a fundamental error occurred at trial," meaning one that "had a probable impact on the jury's finding that [he] was guilty."
 
 Lawrence,
 

 365 N.C. at 518
 
 ,
 
 723 S.E.2d at 334
 
 . This is primarily because evidence concerning the likelihood of a child abuse victim being suicidal, as well as evidence specifically regarding Preston's suicidal ideation, his attempt, and the suicide itself, was all admitted through other witnesses as well as parts of Sikes's own testimony, to which defendant did not object to at trial. Accordingly, even if we agree that evidence of Preston's suicide was relevant but nevertheless prejudicial, we find no plain error where there was other overwhelming evidence from which the jury could have arrived at the same verdict-that defendant sexually abused the victim.
 

 Defendant next argues that the portion of Sikes's testimony on the link between sexual abuse and suicide came before the jury without being evaluated under the standard set out in amended Rule 702. Defendant was indicted on 11 April 2011, and the amendment to Rule 702 applies only to defendants indicted after 1 October 2011.
 
 See
 
 N.C. Gen.Stat. § 8C-1, Rule 702 (2015),
 
 2011 N.C. Sess. Laws 2011
 
 -283, § 1.3, eff. Oct. 1, 2011. Thus, the amendment to Rule 702 is inapplicable to defendant. This argument is wholly without merit. Accordingly, defendant's argument is overruled.
 

 NO ERROR.
 

 Judges CALABRIA and ZACHARY concur.
 

 [1]
 

 A pseudonym will be used throughout as the victim was a minor when the abuse occurred. N.C. R.App. P. 3.1(b) (2015).
 

 [2]
 

 A pseudonym will be used as the victim was a minor when the abuse occurred. N.C. R.App. P. 3.1(b).
 

 [3]
 

 Indeed, in
 
 Clark,
 
 just as in the present case, there turned out to be a sibling who was also abused and in need of protection.
 
 See
 
 --- U.S. at ----,
 
 135 S.Ct. at 2178, 2181
 
 ,
 
 192 L.Ed.2d at 312, 315
 
 .
 

 [4]
 

 "Under Ohio law, children younger than 10 years old are incompetent to testify if they 'appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly.' "
 
 Clark,
 
 --- U.S. at ----,
 
 135 S.Ct. at 2178
 
 ,
 
 192 L.Ed.2d at 312
 
 (quoting Ohio Rule Evid. 601(A) ( Lexis 2010)).
 

 [5]
 

 We do not posit that the CAC interview is a substitute for in-court testimony, but, where, as here, the declarant is unavailable, his video recorded medical interview is sufficiently reliable to be admissible. Therefore, the jury is able to assess the testimony, to observe the demeanor of the declarant, to determine the credibility and trustworthiness of his statements, and thereby perform their function as a jury. This helps satisfy the ultimate goal of the Confrontation Clause.
 
 See
 

 Idaho v. Wright,
 

 497 U.S. 805
 
 , 821-22,
 
 110 S.Ct. 3139
 
 , 3150,
 
 111 L.Ed.2d 638
 
 , 656 (1990) ("The state and federal courts have identified a number of factors that we think properly relate to whether hearsay statements made by a child witness in child sexual abuse cases are reliable.
 
 See, e.g.,
 

 State v. Robinson,
 

 153 Ariz. 191
 
 , 201,
 
 735 P.2d 801
 
 , 811 (1987) (spontaneity and consistent repetition);
 
 Morgan v. Foretich,
 

 846 F.2d 941
 
 , 948 (C.A.4 1988) (mental state of the declarant);
 
 State v. Sorenson,
 

 143 Wis.2d 226
 
 , 246,
 
 421 N.W.2d 77
 
 , 85 (1988) (use of terminology unexpected of a child of similar age);
 
 State v. Kuone,
 

 243 Kan. 218
 
 , 221-22,
 
 757 P.2d 289
 
 , 292-93 (1988) (lack of motive to fabricate). Although these cases (which we cite for the factors they discuss and not necessarily to approve the results that they reach) involve the application of various hearsay exceptions to statements of child declarants, we think the factors identified also apply to whether such statements bear 'particularized guarantees of trustworthiness' under the Confrontation Clause. These factors are, of course, not exclusive, and courts have considerable leeway in their consideration of appropriate factors. We therefore decline to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the Clause.
 
 Rather, the unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made.
 
 " (emphasis added)),
 
 overruling recognized by
 

 Desai v. Booker,
 

 732 F.3d 628
 
 (6th Cir.2013).